[Civ. No. 42145. Second Dist., Div. Two. Apr. 4, 1974.]

LARRY W. HIXON et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

A. L. Wirin, Fred Okrand, Laurence R. Sperber, Steven Fink and Kevin P. Kane for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and Larry C. King, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

John H. Larson, County Counsel, and Ronald L. Schneider, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**COMPTON, J.** — Petitioners who either reside or are employed in that area of Los Angeles County commonly referred to as East Los Angeles appeal from a denial of their petition for a writ of mandate to require respondent County of Los Angeles to obtain an environmental impact report (EIR) in connection with certain street improvements in East Los Angeles, which improvements involve the removal of a quantity of trees.

### THE LEGISLATIVE SCHEME

Public Resources Code section 21151, which became effective November 23, 1970, was in effect at time of trial and read as follows: "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project they intend to carry out, *which may have a significant effect on the environment,* is in accord with the conservation element of the general plan. All other local governmental agencies shall make an environmental impact report on any project they intend to carry out *which may have a significant effect on the environment* and shall submit it to the appropriate local planning agency as part of the report required by Section 65402 of the Government Code."[1] (Italics added.)

This statute is the keystone of the comprehensive statutory scheme

---

[1]In the 1972 Regular Session, section 21151 was amended to read as follows: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. When a report is required by Section 65402 of the Government Code, the environmental impact report may be submitted as a part of that report."

known as the California Environmental Quality Act contained in Public Resources Code section 21000 et seq. (the Act).

Environment is defined by the Act as the physical conditions including land, air, water, minerals, flora, fauna, noise or objects of historic or aesthetic significance which exist within the area affected by a project. (Pub. Resources Code, § 21060.5.) An EIR is an informational document to be considered by public agencies in approving or disapproving a project for the purpose of providing those agencies with information concerning the effect of the project on the environment and ways to minimize any negative effect. (Pub. Resources Code, § 21061.)

The EIR must contain a detailed statement setting forth the following:

"(a) The environmental impact of the proposed action.

"(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.

"(c) Mitigation measures proposed to minimize the impact.

"(d) Alternatives to the proposed action.

"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented.

"(g) The growth-inducing impact of the proposed action." (Pub. Resources Code, § 21100.)

Judicial review of compliance with the Act is limited by the act as to time (Pub. Resources Code, § 21167) and scope (Pub. Resources Code, §§ 21168, 21168.5). Such review is limited to the issue of compliance in terms of the necessity for and adequacy of the EIR and does not appear to extend to the agency's implementation of a project once the report has been obtained or dispensed with. The Act does not circumscribe the agency's discretion after it has received the EIR. Rather it appears to envision that at that point the political process will come into play.

At the heart of the statutory scheme is the agency's authority to make the threshold determination of whether a proposed project "may have a significant effect on the environment." It is this authority which has been and will likely continue to be the trigger for litigation seeking judicial review.

In an apparent effort to avoid repeated resort to the courts the Legislature directed the secretary of the State Resources agency and local

agencies to promulgate guidelines for implementation of the Act (Pub. Resources Code, §§ 21082, 21083). These guidelines shall require a finding of "significant effect on the environment" if any of the following conditions exist: "(a) A proposed project has the potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals; (b) The possible effects of a project are individually limited but cumulatively considerable; (c) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Pub. Resources Code, § 21083.)

Further, the guidelines must include a list of exempt projects which have been determined not to have a significant effect on the environment. (Pub. Resources Code, § 21084.) ■ This is in recognition of the fact that there will be projects which are so de minimis in terms of environmental impact that it would cause unwarranted delay and expense to invoke the elaborate requirements of the Act.

The guidelines which have been adopted by the secretary of the State Resources Agency are set forth in sections 15000-15166 of division 6, title 14 of the California Administrative Code. Germane to the case at bar is the fact that the guidelines do not list tree removal or cutting as an exempt activity. Also relevant is Administrative Code, title 14, section 15083 which provides in part: "A Negative Declaration shall be prepared for a project which would ordinarily be expected to have a significant effect on the environment, but which the Public Agency finds will have no significant effect on the environment due to circumstances peculiar to the specific project.

"(a) A Negative Declaration must include a description of the project as proposed, and a finding that the project will not have a significant effect on the environment.

"(b) The Negative Declaration followed by notice of the action taken regarding the approval or disapproval of the project must be filed with the Secretary of Resources, if the responsible agency is a state agency, board or commission. If the responsible agency is a local agency, as defined in these Guidelines, these documents shall be filed with the county clerk of the county, or counties, in which the project will be located. The Negative Declaration shall be filed with sufficient time before the project is approved to provide an opportunity for members of the public to respond to the finding. The Negative Declaration should not exceed one page in length."

## THE PROJECTS

Commencing in 1969, the County of Los Angeles undertook public works improvement projects in East Los Angeles using a combination of federal and county funding. Two of the projects were known as the Home Project (Home Owners Modernization Effort Project) and the Hereford Drive Project. Both projects involved street widening causing the actual and threatened removal of roadside trees.

### The Home Project

The Home Project (Phase I) consisted of 40 cash contracts for street improvement work. A number of trees were removed under these contracts prior to November 23, 1970, the effective date of the Act. A substantial number of trees were removed at various times after the passage of the Act. No EIR was filed. More than twice the number of trees removed have been replaced. The replacement trees were mainly of the 5-gallon size and could be expected to attain the size of their predecessors in a period from 25 to 30 years. Phase I is substantially completed and all tree cutting is finished.

Phase II of Home has not been funded and therefore no work has begun. It includes specific detailed plans for parkway tree planting as well as the removal of an additional number of roadside trees. Appellants sought to prove that 400 trees will be victims of the roadwidening. Respondent admits only that certain trees will be replaced by others. In any event, respondent assured the trial court that future Phase II Home Projects will be preceded by submission of an EIR to appropriate authorities.[2]

### The Hereford Drive Project

The Hereford Drive Project was initiated by the county in response to requests of the public that corrective action be taken to alleviate unsafe conditions of sidewalks on Hereford Drive caused by tree roots pushing up sidewalks, curbs, gutters and driveways. Thirty-two full-grown carob trees will be removed and be replaced by various varieties of trees.

No EIR was submitted for the Hereford Drive Project but a document entitled "Environmental Impact Study—Final Negative Declaration" was provided. This declaration was intended to serve as a brief one-page recitation of the agency's assessment that the project lacked significant environmental impact and consequently that no EIR need be furnished.

---

[2]Respondents note that they submitted an EIR as required by CEQA on a cash contract for a Home Project subsequent to the judgment and prior to this appeal.

## Findings of the Trial Court

*Home Project*

The trial court found that the county had removed approximately 1,874 trees during the course of Phase I of the project and replaced them with some 3,847 smaller trees; that the time involved during which these trees would reach the same level of maturity as the removed trees was a temporary inconvenience in terms of reduced shade and foliage; that no public benefit would be gained by requiring an EIR and that since the project was completed it would be inequitable to now require an EIR.

The court further found that there would be compliance with the Act by the filing of an EIR on future phases of this project.

*The Hereford Drive Project*

Here the court found as follows:

"1. The Hereford Drive public improvement project (hereinafter "HEREFORD") was initiated by County in response to numerous complaints and requests for affirmative action received by County regarding the dangerous condition of sidewalks, curbs, gutters, and driveway aprons on Hereford Drive.

"2. Said condition consisted in part of raised sidewalks and raised curbs, gutters, and driveway aprons.

"3. Said condition was caused by tree roots pushing up the sidewalks, curbs, gutters, and driveway aprons.

"4. County personally contacted each property owner or those in possession of property within the proposed HEREFORD project area and obtained their consent to the removal of trees pursuant to said project.

"5. The HEREFORD project consists in part of the removal of 32 trees in the parkway area of Hereford Drive and the replacement of curb, gutter, sidewalks, and driveway aprons.

"6. All of the 32 trees to be removed are Carob trees.

"7. It is impracticable to root-prune the 32 Carob trees.

"8. Prior to advertising for bids for the HEREFORD project, County prepared and adopted an Environmental Impact Study, hereinafter 'EIS-HEREFORD,' of the HEREFORD project. A copy of said EIS-HEREFORD is attached hereto as Exhibit 'A.'

"9. Said EIS-HEREFORD indicated and the Court finds that new trees are to be planted on Hereford Drive to replace the trees removed.

"10. The EIS-HEREFORD prepared by County sets forth five reasons for the conclusion contained therein; i.e., that the project will have no significant adverse effect on the environment. The Court finds that said EIS-HEREFORD constitutes a 'good-faith' attempt to comply with the criteria of Section 21100 of the Public Resources Code, as the same reasonably relates to the HEREFORD project.

"11. The Court finds that the EIS-HEREFORD is an informative document which contains sufficient information and factual material to allow County to make an informed judgment as to whether the HEREFORD project 'may have a significant effect on the environment.'

"12. Section 21151 of the Public Resources Code requires that County make a threshold determination as to whether any project it intends to carry out may have a significant effect on the environment.

"13. The Court finds that the EIS-HEREFORD adopted by County finding that the Hereford project will have no significant adverse effect on the environment, is in substantial compliance with the requirements of Section 21151 of the Public Resources Code.

"14. By adopting the EIS-HEREFORD, County has found and determined that the Hereford project will have no significant adverse effect on the environment. There is therefore no further requirement that County prepare and file an EIR on the Hereford project.

"15. The Court finds that County has fulfilled its obligation to consider whether the Hereford project 'may have a significant effect on the environment.' "

On the basis of these findings the trial court denied the petition for mandate.

DISCUSSION

*The Home Project*

■ We agree with the trial court that preparation of an EIR for Phase I alone would be futile. The project is ended, the trees are cut down and the subject is now moot insofar as resort to a planning or informational document, which is what an EIR is.

■ Respondent has assured the court that an EIR will be prepared for Phase II. It thus concedes that removal of trees in such quantities has a significant impact upon the environment. We cannot, however, mandate

an EIR for Phase II since it is only prospective and there have only been assurances of compliance with law rather than refusal. (*Northridge etc. Water Dist.* v. *McDonell,* 158 Cal.App.2d 123 [322 P.2d 25]; *Diller* v. *Flynn,* 226 Cal.App.2d 449 [38 Cal.Rptr. 229].) Preparation of an EIR for Phase II can await the planning process for Phase II. At that time the cumulative effect of both Phase II and Phase I can be considered in compliance with Administrative Code, title 14, section 15069[3] permitting preparation of a single EIR for multiple and phased projects.

*The Hereford Drive Project*

The issue here is not moot. Pending this appeal work on the project has been stayed by a writ of supersedeas issued by this court.

Respondent has made the "threshold determination" that the removal of the 32 trees will not have a significant impact on the environment. It thus filed a negative declaration which is appended to this opinion as Appendix A.

Petitioners, by attacking the sufficiency of the negative declaration, are in reality seeking to have the courts mandate the County of Los Angeles to prepare an EIR to cover all tree removal which may occur in the future at any place in Los Angeles County. They contend that the negative declaration is insufficient since it fails to contemplate the cumulative effect of all other similar projects wherever undertaken. We are not prepared to invoke such a sweeping and pervading application of the Act. It can be argued to the extreme that every tree cut, every bush uprooted, in fact every disturbance of the natural state when combined with every other such occurrence in the entire state or nation may impact the environment.

As indicated, the authority to make the initial impact decision is, by the Act, vested in the public agency. Judicial review of that decision is limited to determining whether there was an abuse of discretion. Such abuse is established where the agency has not proceeded in a manner required by law or has reached a decision not supported by substantial evidence. (Pub. Resources Code, § 21168.5.)

---

[3]Administrative Code, title 14, section 15069 provides: "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the responsible agency or Lead Agency must prepare a single EIR for the ultimate project. Where an individual project is a necessary precedent for action on a larger project, or commits the Responsible Agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project, subject to the limitation of Section 15066 of these Guidelines. Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but should in either case comment upon the combined effect."

■ Petitioners concede that the negative declaration filed here appears to comply with Administrative Code, title 14, section 15083 but suggest that we either strike down that guideline or add judicial gloss to require that a negative declaration take the form of a "Mini EIR." Such a proposal is best addressed to the Legislature. Our task here is to determine whether respondent has complied with the Act as written.

The negative declaration and its counterpart the EIR are informational documents designed to expose to the public the rationale which underlies the agency's decision. By definition a negative declaration deals with a project "which would ordinarily be expected to have a significant effect on the environment but which the Public Agency finds will have no [such] effect." (Tit. 14, Cal. Admin. Code, § 15083.) Such a declaration requires a finding to that effect and should not exceed one page in length.

Petitioners argue that the negative declaration here does not present "a reviewable record" since it fails to mention all "relevant environmental factors." Inherent in the initial impact decision is the decision as to what are relevant factors.

Although the law does not require it, the negative declaration here did set out the factors that were considered. We agree with the trial court that all of the environmental considerations which were relevant to this particular situation were considered in this document. It followed generally the factors listed in Public Resources Code section 21100. We believe that the respondent successfully met the requirements of the Guidelines in setting out the ingredients of their decision. In this latter sense it made a reviewable record by which we mean that it conveyed sufficient information to the public as to why it had determined that no significant impact was present. Respondent proceeded in a manner required by law.

Thus we come to the crucial question of whether respondent abused its discretion in the impact decision represented by its negative declaration. In short, is there substantial evidence to support that decision? We believe there was.

At the outset we are struck by the fact that the instant case involves a unique situation wherein environmental impact is not clearly evident. In this respect it is unlike the cases relied on by petitioners. In *Hanly* v. *Mitchell,* 460 F.2d 640, and *Hanly* v. *Kleindienst,* 471 F.2d 823, the erection of a large jail housing many prisoners having a profound effect upon its neighborhood because of its sheer bulk alone, if not from its unique function, was held to call for an EIS (Environmental Impact Statement under the National Environmental Policy Act of 1969, § 102(2)(c), 42 U.S.C.A. § 4332(2)(c)).

■

*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695 [104 Cal.Rptr. 197], involved the construction of a large water supply and storage system; *Keith* v. *Volpe,* 352 F.Supp. 1324, was concerned with the construction of the Century Freeway; *Arlington Coalition on Transportation* v. *Volpe,* 458 F.2d 1323; involved the construction of Interstate 66 through Arlington, Virginia; and *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], involved a series of condominiums which threatened high population density.

All of the above exemplify massive impingment upon the environment. The relative effect of the loss of 32 trees when compared to examples involving massive building, freeway construction, huge water systems would tend to make their disappearance relatively insignificant in comparison to the overall environmental problem.

In contrast, *Citizens for Reid State Park* v. *Laird,* 336 F.Supp. 783, illustrates the situation wherein the impact upon the environment was considered to be so negligible as to permit dispensing with an EIS. An injunction had been sought against Navy landing maneuvers. No EIS had been prepared or filed but the Navy had made detailed inspection and study of the area. The Navy had determined that apart from damage to lichens and small shrubs that the overall effect of the landings would be negligible. The injunction was denied.

The court in *Citizens* noted that the statutory language "significantly affecting the quality of the human environment" is extremely broad and not susceptible to precise definition. The standard of review in such cases is limited, for in the language of the Supreme Court: "Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the [agency's] decision 'has "warrant in the record" and a reasonable basis in law.'" (*Atlantic Rfg. Co.* v. *FTC,* 381 U.S. 357, 367 [14 L.Ed.2d 443, 452, 85 S.Ct. 1498], citing *Board* v. *Hearst Publications, Inc.,* 322 U.S. 111, 131 [88 L.Ed. 1170, 1185, 64 S.Ct. 851].) The present case in context appears to be more akin to *Citizens* than to the previously described cases involving substantial impact on the environment.

That a wholesale cutting of trees would bring about a strong and unfavorable effect on the environment is patent. Petitioners, however, argue that the cumulative effect of cutting trees singly or a few at a time would amount to the same thing as their destruction in one fell swoop. By analogy they would argue that many tiny drops make a mighty torrent. The critical ingredient of the analogy, however, is time. Certainly successive

tree cutting done within a compressed time frame would equate to large scale destruction as the simultaneous confluence of many streams of water would cause a flood. A planned removal of trees done as a part of routine and ordinary highway maintenance, however, would insure that removal would be gradual. In short, the passage of time can have the effect of reducing the impact of alterations in the environment.

The clause "may have a significant effect on the environment," can be interpreted to mean that a reasonable possibility exists that the proposed project may have an important effect on the environment. The administrative definition of significant effect as set forth in California Administrative Code, title 14, section 15040 is ". . . a substantial adverse impact on the environment."

The semantical or word game which results from in turn attempting to define "substantial" and "important," a task, which, in this context the courts are ill-equipped to perform, leads us to appreciate the wisdom of the Act which vests wide discretion in the public agency subject essentially to the control of the political process.

In construing the federal act, the court in *Calvert Cliffs' Coord. Com.* v. *United States A. E. Com'n*, 449 F.2d 1109 [146 App.D.C. 33, 17 A.L.R. Fed. 1], stated at page 1112: "Congress did not establish environmental protection as an exclusive goal; rather it desired a reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations. . . . Thus the general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." These observations are equally applicable to the CEQA.

Voters in Los Angeles, at appropriate elections involving responsible county officials, may by their selection of such officials decide that the replacement of 32 full-grown carob trees with trees of smaller size is too high a price to pay for repairing broken curbs and sidewalks, but we cannot say as a matter of law that in a county of 7 million people with hundreds, if not thousands, of miles of streets and untold numbers of trees, that there is a reasonable possibility such replacement may have an "important" effect on the environment or a substantial adverse impact. Respondent's decision was not an abuse of its discretion.

## AWARD OF ATTORNEY'S FEES

Petitioners contend that as volunteers they have sought to confer a benefit upon all Californians by forcing through litigation an effective

administration of the CEQA by responsible public officials. They maintain that a court may in the exercise of its equitable jurisdiction award fees to those who achieve this benefit for the public at their own expense. The trial court refused to make such an award.

■ Generally, attorney's fees are not recoverable as costs except where allowed by statute. (*Miller* v. *Kehoe,* 107 Cal. 340 [40 P. 485]; *County of Los Angeles* v. *Ortiz,* 6 Cal.3d 141 [98 Cal.Rptr. 454, 490 P.2d 1142]; 13 Cal.Jur.2d, Costs, § 36, p. 258.)

■ There is no such statutory provision for fees in this action and petitioners, being unsuccessful in their efforts, evoke no equitable response. The trial court correctly denied an award for attorney's fees.

The judgment is affirmed. The writ of supersedeas is vacated.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied April 24, 1974, and appellants' petition for a hearing by the Supreme Court was denied June 26, 1974. Mosk, J., was of the opinion that the petition should be granted.

LOS ANGELES COUNTY ROAD DEPARTMENT
ENVIRONMENTAL IMPACT STUDY
HEREFORD DRIVE—CASH CONTRACT 2355
FINAL NEGATIVE DECLARATION

Pursuant to: Division 13, California Public Resources Code

## 1. LOCATION AND DESCRIPTION OF PROJECT

The project is located in a residential area on Hereford Drive between Olympic Boulevard and Hendricks Avenue in the unincorporated area of Los Angeles County.

Repair of tree-damaged parkway improvements are supported by the adjacent property owners who agreed with the removal and replacement of trees. This concrete repair work will be accomplished in accordance with the policy approved by the Board of Supervisors on June 18, 1968.

The project will construct concrete gutters and reconstruct portions of the existing curbs, driveways, sidewalks, and pavement. In addition, the entire pavement will be sealed with slurry.

## 2. PURPOSE OF PROJECT

The purpose of the project is to increase motoring and pedestrian safety and convenience, to improve roadway drainage, and to enhance the appearance of the roadway and parkways.

## 3. DISCUSSION OF ENVIRONMENTAL IMPACT

The only right-of-way to be acquired is a small parcel necessary for the construction of the southerly alley intersection curb return on the alley south of Olympic Boulevard at Hereford Drive. No structures will be removed. There will be no increase in traffic volume due to the new construction, therefore, there will be no increase in noise or vehicle emissions.

The existing curb, walk, and driveways have been severely damaged by extremely large surface roots of the parkway trees. In some locations, the curb has moved one-foot laterally and the walk two-feet vertically. Thirty-two large carob trees (18 inches to 36 inches in diameter) must be removed.

After completion of the project, new trees will be planted that have been selected by the Department of Parks and Recreation for use in parkways.

## 4. BASIS FOR NEGATIVE DECLARATION

The project will have no significant adverse effect on the environment for the following reasons:

a. Nearly all of this project will be constructed within the existing right-of-way and no structures are involved.

b. There will be no increase in noise level or vehicle emissions.

c. Safety for both motorists and pedestrians will be increased.

d. Aesthetic qualities will be improved.

e. The impact of removing trees from the parkways will be offset by planting of new parkway trees after completion of the road project.