[No. B156529. Second Dist., Div. Seven. Sept. 11, 2002.]

ARVIV ENTERPRISES, INC., Plaintiff and Appellant, v.
SOUTH VALLEY AREA PLANNING COMMISSION et al., Defendants
and Respondents.

1334

## COUNSEL

Gerald Krupp, Bernard Lauer and Ronald P. Kaplan for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Susan D. Pfann and Jack L. Brown, Assistant City Attorneys, for Defendants and Respondents.

## OPINION

JOHNSON, Acting P. J.—In a series of permit applications and overlapping reviews over a short period of time, a housing developer managed to secure among other things (1) a series of permits to build five houses downslope from Mulholland Drive; (2) a categorical environmental exemption to build two additional houses across the street; (3) a mitigated negative declaration to build 14 additional houses on an adjacent street; and (4) a variance for one of the five houses built over height. Prompted by nearby residents' and homeowner associations' complaints, the City of Los Angeles came to realize the cumulative effects from what was in reality a development project for 21 hillside houses required an environmental review of the project as a whole. It thus imposed a building hiatus for six months, or until an environmental impact report (EIR) was completed and certified. The developer sought an administrative writ of mandate to challenge the City's requirement for an EIR covering all 21 proposed houses, which included those already constructed, although the specific appeal then before the commission technically concerned only two of the proposed houses. The trial court denied the developer's request for relief. We find no abuse of discretion. Accordingly, we affirm.

### FACTS AND PROCEEDINGS BELOW

Yehuda Arviv is president and chief executive officer of appellant Arviv Enterprises, Inc. (collectively Arviv). He has been a land developer in the Los Angeles County area since the 1970's. Sometime in the 1980's Arviv began purchasing lots on a steep hillside in the Mulholland Scenic Parkway

Specific Plan area of Los Angeles. Arviv ultimately purchased 21 legal lots (14 on Leicester Drive and seven on Woodstock Road) with the intention of building a house on each of the hillside lots.[1] The lots are both upslope and downslope and are located south of Mulholland Drive.

In December 1987, Arviv received a preliminary geological and soils engineering report regarding "proposed 11 residences." The report concluded construction of the proposed project was feasible, provided Arviv followed its numerous recommendations. Among other things, the report recommended foundations be set in bedrock. The report noted conventional footings could be used on the ascending lots once cut pads had been excavated. Deeper foundations with pylons were recommended for building on the descending lots. The report noted "fill and soil on the site are not surficialy stable and therefore subject to erosion. It is recommended that the loose surficial materials be trimmed from the slopes or supported with walls and grade beams." Further, the report suggested fill slopes be constructed at a 2:1 gradient and that subdrains be placed at the base of all fills and along the axis of drainage courses.

In March 1988 the engineering department of the City of Los Angeles approved the geological, grading and soils report, conditioned on following all recommendations mentioned in the report and more. Arviv's plans lay dormant for the next 10 years.

In the meantime, in 1992 the City of Los Angeles (City) adopted Ordinance No. 167,943 known as the Mulholland Scenic Parkway Specific Plan. The plan imposes land use and design controls to protect the Mulholland area as a scenic and recreational asset for the city as a whole. Persons wishing to develop homes within the Mulholland Scenic Parkway area must first submit a development application to the Mulholland Design Review Board (Board).[2] The Board does not review all aspects of a proposed development. Instead, the Board's primary concern is whether a proposed project is consistent with the Mulholland Scenic Parkway Specific Plan in terms of aesthetics and potential environment impacts. The Board holds public hearings regarding specific development proposals seeking approval. The Board ultimately forwards its recommendation to the City's planning director for determination.[3]

In 1998 Arviv submitted an application with plans and specifications to build three houses on Woodstock Road. Arviv presented an updated geological and soils report which concluded the site conditions had not changed

---

[1]Technically, Arviv purchased 22 legal lots but intended to use three of the lots on Woodstock Road to build two very large houses.

[2]Los Angeles Municipal Code section 16.50.

[3]Los Angeles Municipal Code section 16.50, subdivision D1.

substantially since the earlier report. However, it noted "[s]everal surficial failures . . . on the downslope edges of Leicester Drive and Woodstock Road, particularly along the axis of the two secondary northwesterly draining natural swales. Portions of the near vertical cut slopes on the uphill side of Woodstock Road and Leicester Drive have experienced rock falls."

In November 1998 the City's planning department approved Arviv's proposal to build on Woodstock Road. The City also approved an environmental clearance. The City's department of building and safety thereafter issued Arviv a building permit. The City did not require Arviv to seek preliminary approval from the Board.

Immediately thereafter Arviv filed an additional application to build two more houses on Woodstock Road. The City's planning department approved construction of these two homes as well. Again, the City's department of building and safety issued a building permit without even requesting an initial environmental study, and again gave Arviv building clearances without first requiring approval from the Board.

Arviv built the five homes on Woodstock Road. By March 2000, four houses were completely built and the fifth house was 80 percent complete.

In March 2000 Arviv filed a third application to build two additional houses across the street from the five existing houses on Woodstock Road. On three lots, Arviv intended to build two 5,500- and 5,885-square-foot two-story houses. This time City planning department staff directed Arviv to file for design review with the Board.

While the two-house project was in the design review process, in May 2000 Arviv filed yet another application to build 14 houses on the lots on Leicester Drive. For this project the City's planning department prepared an initial environmental study and checklist. Thereafter the City's planning department prepared and approved a mitigated negative declaration (MND), which imposed among other conditions, approval by the Board. The MND noted aesthetic impacts, air pollution impacts, erosion/grading impacts, storm water and runoff impacts, emergency service impacts, and others. The MND stated it would thus require input and ultimate approvals from relevant agencies before occupancy permits would issue. The mitigated negative declaration concluded "these potential impacts will be mitigated to a level of insignificance by imposing the above mitigation measures."

The Board held a meeting in June 2000 to review Arviv's proposal to build the two additional houses on Woodstock Road. Several neighboring

residents complained about specific problems presented by Arviv's ongoing construction at the five homes directly across the street from the two proposed houses. At this meeting the Board noted Woodstock Road would need to be widened to accommodate emergency personnel to service what would now be seven houses on that street. The Board acknowledged the required modification would necessarily result in changes in Arviv's proposed plans then under consideration. The Board nevertheless gave conditional approval to Arviv's two-house project. It noted impacts and issues regarding the first five houses were not then before the Board.

The only conditions imposed by the Board included a maximum height limitation of 40 feet, a lighting plan, additional landscaping plans and color plans. The Board's report notes the two-house project was categorically exempt from environmental requirements.

The Board forwarded its recommendation to the City's director of planning. On June 15, 2000, the City's director of planning and principal city planner concurred with the Board's findings, recommendations and conditions.

Two local residents appealed the City's director of planning's decision to the area planning commission. Respondent South Valley Area Planning Commission (Commission) is responsible for administrative appeals from the director's determinations on projects within the Mulholland Scenic Parkway Specific Plan. The residents' appeals claimed the proposed houses violated the Mulholland Scenic Parkway Specific Plan because (1) their size exceeded the plan's limitations; (2) they required grading in excess of 5,000 cubic yards of soil; (3) the proposed height of the houses will block neighbors' views; (4) necessary grading will undermine a nearby resident's retaining wall; and (5) the proposed project does not include provisions for sewer connections.

City planning department staff responded in writing to each claimed flaw. Staff recommended the Commission deny the appeals.

Prior to the July 2000 public hearing on the residents' appeals the City's planning department received numerous comment letters from neighboring residents and homeowners associations challenging the adequacy of its MND regarding the 14 proposed houses on Leicester Drive, the first MND the City prepared for an Arviv project. By way of example, counsel on behalf of the appealing residents and the Mount Olympus Homeowners Association wrote a letter to the supervisor of the City's environmental unit. In his letter counsel argued the proposed MND was inadequate and urged the

City to require an EIR to ensure review of the project as a whole. Counsel's letter also pointed out some specific problems with the proposed project. Counsel pointed out grading for the initial five houses resulted in slope failures, as well as mud slides and rockslides which dumped onto a residence and Thames Street below. The five recently built homes exceeded the height limitations of the Mulholland Scenic Parkway Specific Plan and impaired the aesthetics of the area. Counsel noted Woodstock Road is unpaved and presents erosion, water runoff and mud and dust problems for local residents. However, no mitigation measure in the MND addresses the problems posed by the unpaved road. Moreover, the width of the existing road is inadequate for emergency vehicles. Although the MND recognized this fact and mandated a 20-foot wide paved street and fire hydrants every 300 feet, it did not also require as part of the road design a turnaround area for fire trucks or, in the alternative, a through street to permit access for emergency trucks and vehicles. Also, because the proposed streets are also insufficiently wide to accommodate trash trucks, residents would have to haul their trash to the end of the street, presenting an attractive nuisance for rats and other small animals. However, the MND suggests no mitigation measures.

City planning department staff responded to the comment letters and complaints regarding the 14 proposed houses on Leicester Drive. Staff expressed the view Arviv's compliance with the proposed mitigation measures recommended in the MND would resolve the identified problems. However, the Board did not agree. It ultimately recommended Arviv's proposed 14-house project on Leicester Drive be disapproved.

The Commission heard the residents' appeals concerning the two additional houses on Woodstock Road on July 27, 2000. City staff again recommended the appeals be denied and the two-house project be approved. Counsel for the appellants and the Mount Olympus Homeowners Association objected to granting the project a categorical exemption from all environmental review. He argued the appeals should be granted, if for no other reason, because Arviv's plans before the Commission were no longer valid given the fire department's conditions for a wider street and turnaround area. Land to satisfy street width and turnaround requirements would necessarily leave less land on which to build. This, in turn would require revisions to Arviv's existing plans to meet these requirements.

Counsel also complained Arviv was attempting to go around the rules by developing in a piecemeal fashion in order to take advantage of environmental exemptions for projects of three or fewer single-family residences. He pointed out the first five houses had never been subjected to any environmental review or negative declaration, and had not even gone before the

Board. Prior to the hearing counsel had inquired of City staff. Staff claimed they were not aware the same applicant had already built five homes on the same street until they did a site inspection regarding the two houses then before the Commission. Counsel then informed the Commission Arviv had yet another pending application for an additional 14 houses on adjacent Leicester Drive and requested the Commission to order an environmental assessment of the development as a whole.

Prior to counsel's comments at the July 2000 hearing Commission members, and at least some of the City's planning staff, had been unaware Arviv's project was in reality a 21-house project.

A representative from the Hillside Federation also argued the appeals should be granted. She argued the appealed issues of grading problems and oversized houses had merit. The representative pointed out the Mulholland Parkway Specific Plan restricts building height to 40 feet. The permits the City issued to Arviv for the first five houses permitted heights between 36 and 45 feet. However, the five existing houses were in fact built between 46 and 51 feet high, exceeding all legal limits. The representative also argued Arviv's proposed sewer system was ill-conceived since it would require major excavation through the hillside and down to an adjoining street, and thus should not be approved.

The representative from the Hillside Federation also expressed the view the City's approvals to date were based on misrepresentations and inadequate information from Arviv. She argued a stop order should issue until the entire development could be adequately judged for its environmental effects.

After much discussion concerning the new information, and after securing agreement from Arviv, the Commission ordered an environmental review in the form of an MND covering seven houses—the two most recently proposed houses and the already constructed five houses—and continued the hearing on the appeals.

Thereafter the City prepared an initial environmental study and checklist regarding the seven houses on Woodstock Road. It issued another MND for the combined seven-house project. Again the City's planning department received comment letters opposing its decision to issue a MND for the seven houses on Woodstock Road. The Willow Glen Area Homeowners Association argued the MND was inadequate due to its lack of specificity and because it did not impose sufficient conditions to ensure mitigation measures would actually be undertaken or be effective. It mentioned specific areas of

concern, namely (1) a faulty sewage connection design; (2) the absence of required storm drains or other drainage mitigation measures; (3) lack of a concrete plan for a turnaround area for emergency trucks and garbage trucks; (4) no mitigation measures for dust and mudflows despite the known slope failures which have occurred since Arviv began construction; (5) insufficient enforcement of landscaping plans to disguise huge proposed retaining walls; and (6) the MND's failure to address the height violations of the existing houses. The homeowners association representative pointed out the City's planning department identified these areas as potentially significant in the initial study and checklist but they were inadequately addressed in its MND. Finally, the association objected to the MND because it failed to take into account the cumulative impacts from the overall project, which in its view warranted full environmental review.

An organization called Mulholland Tomorrow echoed many of the concerns of the Willow Glen Area Homeowners Association. It was particularly concerned about the potential for visual blight on the Mulholland Scenic Parkway. It expressed the view the "cumulative environmental impacts of this cluster of related construction projects on Woodstock Road and Leicester Drive should be considered together, and a mitigation plan encompassing the entire project site [should be] prepared and implemented."

Prior to the continued hearing local residents submitted photographs of the mud slides, sinkholes and slope erosion mentioned in the comment letters.

Planning department staff responded to the concerns raised in the comment letters and rejected all objections to the MND for the seven houses on Woodstock Road. The City's staff report concluded "[d]ue to the limited number of developable, legal lots in the area, the initial study did not recognize any cumulative impact relative to the proposed project. Each individual, future planned project must go through an environmental assessment and will be required to mitigate their own impacts individually. However, this issue may be brought [to] the attention of the Decision Maker for further consideration. [¶] Nothing has been presented to the Planning staff to support the argument that the proposed mitigation measures would not be effective in reducing the potential impacts to less than significant levels."

On the agenda for the continued hearing on the two appeals planning staff stated "Staff recommends denial of the appeals."

However, sometime before the continued November 2000 hearing the City's planning department staff had a change of heart. Staff concluded the

MND was inadequate because it failed to take into account cumulative impacts from Arviv's various individual projects. It thus recommended suspending further action on the appeals until at least a focused environmental impact report could be prepared for all 21 houses.

At the hearing, representatives from local homeowners associations described their specific concerns about the past and potential future construction on Woodstock Road and Leicester Drive. Numerous residents from the immediate vicinity described the negative impacts the existing construction has had on their property and discussed their concerns about further development without adequate safeguards to prevent these types of problems. Ann Roos, a deputy to Councilman John Ferraro, described the problems the councilman had had in the past year concerning this construction project, particularly with regard to grading issues and mud slides.

Arviv also spoke at the hearing. He claimed the City planning department knew all along he owned and intended to develop all 21 lots. He claimed the geological report should have put the City on notice he always intended to develop the property. He argued it was unfair to do everything asked of him by City officials and then at the last minute have planning staff change course. Arviv stated he did not mind preparing an EIR for the proposed 14 houses on Leicester Road. However, he objected to any interference with the five houses for which he had already received permits, and which were already built and ready for sale. He also objected to including the two additional houses on Woodstock Road for which the City planning department had already given him a categorical environmental exemption.

When questioned Arviv acknowledged a categorical exemption was by its terms only valid for three or fewer houses. Arviv also agreed each of his five existing houses exceeded the height restrictions of the Mulholland Scenic Parkway Specific Plan, the Hillside ordinance, as well as the height limitations specified in the permits issued by the City. Arviv explained he already acquired a variance for one of the houses and would seek additional variances for the others.

At the conclusion of the hearing the Commission president recommended issuing an order for an EIR for the entire 21-house project. The Commission president explained his reasoning as follows: "We had a lot of members come forward and testify today about some of the impacts that they have observed while this development is ongoing. We had people talk about the difficulties with the sewer connections. We had people talk about the drainage and runoff issues. . . . Mr. Arviv did concede that there is an issue with respect to the fire safety hazard on the project.

"We also have these supporting evidence [*sic*] that was provided to us, dust and water mud flow problems, traffic problems that would be developed, significant grading that was going to be happening with respect to these 21 projects, aesthetics as well as height.

"The fact is that this was a 21-unit project development. It's all being developed by Mr. Arviv, and it's significant that this development be looked at [as] a whole. The environmental impact report is intended to—or the reason behind doing one is intended to preserve the integrity of a development so to speak and to ensure that the development meets these minimum requirements at least to satisfy any types of environmental concerns that may be raised.

"I understand that, Mr. Arviv, you think that everybody is against you and opposing you in this case, and you may feel that there is some delay, but I also find that a lot of this delay is attributed to the actions that you've taken in this case. [¶] Attempting, for example, to try to bring two projects at a time and then coming back and bringing two projects at a time is something that was somewhat misleading, so to speak, when you knew all along that there was a 21-unit project development that you intended to develop and go forward with. [¶] As a developer in this area for 20 years, you should also be aware of the fact that sometimes an environmental impact report is required. Although you may not have encountered one at this point in time, it is not unusual that after a mitigated negative declaration comes about that an environmental impact report is then required. [¶] I think that based on the evidence that was presented to us today, I think that a fair argument can be made that this project has a significant impact."

The Commission suspended the case for six months to prepare an EIR.

Arviv sought a writ of mandate in the trial court to overturn the Commission's decision. The trial court found categorical exemptions from environmental requirements would not have been available to Arviv had the project been properly described as a 21-unit development, instead of only two to three houses per application. The court agreed with the Commission's conclusion the record contained substantial evidence to support a fair argument significant adverse environmental impacts may occur as a result of the proposed 21-house project. Accordingly, the trial court denied the requested relief. This appeal followed.[4]

---

[4]The Commission suggests this appeal may not be ripe, claiming Arviv failed to exhaust his administrative remedies by appealing its decision to suspend time limits for six months in order to prepare an EIR. In our view the Commission takes an unduly narrow view of its own

## DISCUSSION

I. *The Overall Record Contains Substantial Evidence a Fair Argument Can Be Made the 21-house Project Will Have Significant Environmental Effects.*

▆▆ Arviv claims there was no substantial evidence presented to the Commission to support its decision to override the MND in favor of an EIR. Specifically, Arviv complains the Commission heard no expert testimony, but only the argument and "unsubstantiated opinion" of lay witnesses. Arviv's argument is not well taken.

The California Environmental Quality Act (CEQA)[5] requires a governmental agency to "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that *may* have a significant effect on the environment."[6]

CEQA guidelines define "significant effects" as "physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project."[7] Examples of direct physical changes in the environment include "dust, noise, and traffic of heavy equipment . . . ."[8] Indirect environmental changes can include reasonably foreseeable population growth in a given service area.[9]

▆▆ "If the lead agency determines there is substantial evidence in the record that the project may have a significant effect on the environment, the lead agency shall prepare an EIR (*Friends of B Street v. City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]). Said another way, if a lead

decision. Arviv is not aggrieved by the short hiatus, but instead by the Commission's actions expanding the subject matter of the appeals, and by ordering an environmental review of his entire 21-house project, rather than simply the two-house project then under consideration. Moreover, even if an appeal regarding the two-house project had been successful, it still would not have provided the relief he seeks of overturning the more crucial order requiring an EIR for all 21 lots. For this reason, we agree with Arviv the Commission's order for an EIR was final in all essential respects.

[5] Public Resources Code section 21000 et seq.

[6] *Public Resources Code section 21100, subdivision (a), italics added.* Similarly, CEQA guidelines specify "[i]f there is substantial evidence, in light of the whole record before a lead agency, that a project may have a significant effect on the environment, the agency shall prepare a draft EIR." (Cal. Code Regs., tit. 14, § 15064, subd. (a)(1).)

[7] California Code of Regulations, title 14, section 15064, subdivision (d).

[8] California Code of Regulations, title 14, section 15064, subdivision (d)(1).

[9] California Code of Regulations, title 14, section 15064, subdivision (d)(2).

agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect. (*No Oil, Inc v. City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66]).''[10]

■ On appeal, we independently review the record and determine whether there is substantial evidence in support of a fair argument the proposed project may have a significant environmental impact.[11] Because the appellate court conducts a de novo review of the record, the trial court's reasoning, findings or conclusions are not dispositive.[12]

■ This entire case is the direct result of inadequate, or misleading, project descriptions. In other words, it is entirely possible a two-house project—located somewhere other than the steep slopes of the Mulholland Scenic Parkway Area—may in fact have a de minimus, or mitigatable, effect on the local environment. However, Arviv never intended a two or three house project. As he admitted at the hearing before the Commission, he always envisioned a 21-house development. Apparently the City's planning department staff was never able to link the various projects together until the July 2000 hearing when members of the public complained, not only about the two additional homes on Woodstock Road, but also the 14 on Leicester Drive then under review, as well as the five existing homes for which Arviv never sought Board approval.

The significance of an accurate project description is manifest, where, as here, cumulative environmental impacts may be disguised or minimized by filing numerous, serial applications. However, "environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.''[13]

By the November 2000 hearing the City's planning department agreed it had failed to consider the cumulative effects from the various construction

---

[10]California Code of Regulations, title 14, section 15064, subdivision (f)(1).

[11]*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 151 [39 Cal.Rptr.2d 54].

[12]*Stanislaus Audubon Society, Inc. v. County of Stanislaus, supra,* 33 Cal.App.4th 144, 151.

[13]*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; see also *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893] (county abused its discretion in adopting negative declarations for each portion of the project because it failed to consider the cumulative impacts of the project as a whole); *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498] ("A narrow view of a project could result in the fallacy of division, that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole.").

projects under consideration in the sensitive hillside area. It thus recommended the Commission order an EIR to consider the overall effects from the project as a whole. We agree with the Commission a review of the entire record demonstrates substantial evidence to support a fair argument the overall project may have substantial environmental effects.

By the time the Commission made its decision the record before it contained substantial evidence of environmental impacts regarding all the projects. For example, it heard concrete evidence of problems neighboring residents had encountered from construction of the first five homes on Woodstock Road. Residents and representatives from homeowners associations described mud slides, rockslides, soil erosion and other slope failures which occurred during grading for the constructed homes. One of the appellants downslope from the new construction explained how soil erosion had undermined his retaining wall. Other local residents described the dust pollution from the grading activities and as a result of construction vehicle traffic on the largely unimproved Woodstock Road. Some of these local residents provided the Commission with photographs of the sinkholes, mud slides and rockslides and water runoff problems they described in their testimony.[14] The relevant personal observations of these residents alone constitutes substantial evidence of environmental impacts.[15] Contrary to Arviv's argument, scientific or expert studies are not required to provide substantial evidence to support a fair argument the project may have significant environmental impacts.[16]

The Commission also had before it specific challenges to the adequacy of the two mitigated negative declarations. For example, the Willow Glen Area Homeowners Association pointed out there were currently no sewer connections for the existing and proposed homes on Woodstock Road, which as noted, is largely unimproved. Arviv's plans entailed running sewer laterals down the hill to Leicester Drive (which is also unimproved) to an easement to a sewer connection on Thames Street below. Improving Leicester will require the removal of thousands of cubic yards of hillside, and the construction of retaining walls 300 feet in length and 20 to 50 feet high. However, the MND's did not describe the environmental impacts from this plan, and for this reason, did not specify any mitigation measures.

The homeowners association pointed out inadequate emergency access, as well as increased traffic, were identified as potential impacts in the initial

---

[14]These photographs are a part of the record under review.

[15]*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1351-1352 [272 Cal.Rptr. 372] (in the context of an administrative hearing, relevant personal observations of an adjacent property owner are evidence).

[16]See *Stanislaus Audubon Society, Inc. v. County of Stanislaus, supra*, 33 Cal.App.4th 144, 152.

environmental study and checklist. However, the MND's failed to specify particular mitigation measures, even though the fire department made it clear emergency vehicles needed a portion of the street dedicated for a turnaround area.

Counsel for the appellants and the Mount Olympus Homeowners Association wrote comment letters and testified before the Commission. He identified the cumulative impacts from the 21-house project based on his clients' observations and the City's initial environmental studies and checklists as mud slides and rockslides, no sewer connections, runoff with no storm drains, inadequate emergency access, increased traffic hazards, aesthetics of the existing and proposed over-height structures, and the like.

Ann Roos, deputy to Councilman Ferraro, told the Commission, "These homes were slipped in in different ways, and it prevented us from ever really grasping what was happening. Since then in the last, I'd say, three or four months, we've had two meetings which our office put together, and we've had maybe 15 representatives from different city departments, trying to get a handle on what is going on. It is very complicated. It includes the homes on Leicester as well as the homes on Woodstock. [¶] An E.I.R. would do much to remedy what has happened in this area and I think would express the City's concern for the community who feel that things are not being regulated at all. So we would greatly appreciate [it] if you would vote to require[] an E.I.R. and include all 21 homes."

While Arviv may argue "no single piece of evidence standing alone requires preparation of an EIR, when the record as a whole is studied, the collective weight of the evidence supporting" the Commission's decision is substantial.[17]

## II. *The Commission's Order For an EIR Covering All 21 Houses Does Not Interfere with Any of Arviv's Vested Rights.*

 Arviv contends he has a vested right to proceed with his development without having to complete an EIR based on permits already issued, and environmental clearances already obtained. Arviv relies on the Supreme Court's decision in *Avco Community Developers, Inc. v. South Coast Regional Com.*[18] in support of his argument.

In *Avco,* the developer owned thousands of acres of land in Orange County, a part of which it intended to develop as a planned community

---

[17]*Stanislaus Audubon Society, Inc. v. County of Stanislaus, supra,* 33 Cal.App.4th 144, 152.
[18]*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546].

development in Laguna Niguel. The county zoned the tract for a planned community development and issued the developer rough grading permits. Avco began building storm drains, culverts, street improvements, utilities and similar facilities for the planned community and another tract. The Legislature then passed the California Coastal Zone Conservation Act of 1972. The act specified any person wishing to develop within the coastal zone after February 1, 1973, had to secure permission from the Coastal Commission. By this date the developer had spent millions of dollars preparing the tract. However, it had not yet submitted building plans and had not yet received a building permit from the county.[19]

The developer objected to the new requirement, claiming it had a vested right to construct the planned community without a permit from the commission. The *Avco* court acknowledged the long-standing rule "in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.] Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied."[20]

The court concluded because the developer had not yet acquired a building permit, and thus had not expended substantial efforts in reliance *on such permit*, it had not acquired a vested right to complete the development without first obtaining permission from the Coastal Commission.[21]

Similarly in the case at bar Arviv has not demonstrated requiring an EIR in any way impinges on any claimed vested right. ██ ██ The City has not issued Arviv a building permit for the 14-house project on Leicester Drive.[22] Arviv also has not secured a building permit for the two additional houses on Woodstock Road. There is no argument to the contrary. The City did issue Arviv building permits for the five initial houses on

---

[19]*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d 785, 789-790.

[20]*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d 785, 791.

[21]*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d 785, 791-799.

[22]In the alternative, Arviv argues the fact the City's planning department issued a proposed MND for the 14 houses on Leicester Drive made environmental review for this aspect of the project final and conclusive. (Citing, Pub. Resources Code, § 21080.1, subd. (a) [absent an appeal, the lead agency's final EIR or MND is conclusive, even as to the agency].) He thus

Woodstock Road. However, it did not do so in accordance with then existing applicable law. Both CEQA and the Mulholland Scenic Parkway Specific Plan existed at the time Arviv acquired permits to build the initial five houses. Compliance with these existing laws was thus required notwithstanding the City's failures and/or Arviv's misleading project descriptions which may have prevented the City from appreciating the full scope of the proposed development. In short, the *Avco* decision provides no support for Arviv's argument.

The decision in *Hixon v. County of Los Angeles*[23] is similarly unavailing. In *Hixon* petitioners sought mandamus to compel the county to obtain an EIR for a street-widening project which caused the actual and threatened removal of roadside trees. By the time of the hearing on their petition the county had already completed phase I of the street widening project. It had removed approximately 1,874 mature trees and had already replaced them with some 3,847 smaller trees.[24] The court agreed with the county that preparing an EIR for phase I of the project alone would be futile. "The

claims the subsequent order for an EIR regarding these particular lots was invalid and should be set aside.

To accept Arviv's argument would render the public review period meaningless if an agency's proposed action was final and conclusive on issuance, even absent valid input from the public or even other interested agencies, such as the fire department in this case regarding the turnaround area. In any event, the proposed MND pertaining to these 14 houses was also subject to approval from the Mulholland Design Review Board. As noted, the Board disapproved the project, citing the various environmental concerns raised by the initial environmental study and checklist.

More to the point, the matter was still pending before the City's planning director for determination by the time of the November 2000 hearing before the Commission, awaiting staff's reanalysis of environmental effects. At the November 2000 hearing planning department staff member, Mr. Jack Sedwick, informed the Commission the director was withholding adoption of the MND for the 14 houses pending a reanalysis of the cumulative environmental effects of the overall project. Of course, the Commission's order for an EIR covering all 21 lots precluded the planning director from taking any further action on the Leicester project.

Thus the record makes clear the proposed MND for the 14 houses on Leicester Drive was neither final nor conclusive. Moreover, the City's planning director could not have legally "adopted" the proposed MND in the face of substantial evidence of environmental impacts in any event. As CEQA guidelines make clear, an agency "shall adopt the proposed . . . mitigated negative declaration only if it finds on the basis of the whole record before it (including the initial study and any comments received), that there is no substantial evidence that the project will have a significant effect on the environment and that the . . . mitigated negative declaration reflects the lead agency's independent judgment and analysis." (Cal. Code Regs., tit. 14, § 15074, subd. (b).) In the present case the lead agency ultimately concluded the mitigated negative declaration was inadequate and that the cumulative environmental effects from the overall project warranted an EIR. In short, Arviv's argument he had a final and conclusive environmental clearance on the 14 Leicester Drive lots lacks merit.

[23]*Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370 [113 Cal.Rptr. 433].
[24]*Hixon v. County of Los Angeles, supra,* 38 Cal.App.3d 370, 377.

project is ended, the trees are cut down and the subject is now moot insofar as resort to a planning or informational document, which is what an EIR is."[25] On the other hand, the court noted an EIR could be prepared for the second phase when planned, and "[a]t that time the cumulative effect of both Phase II and Phase I can be considered in compliance with [CEQA]."[26]

Unlike the situation in *Hixon*, the issues an EIR will address in the case at bar are not moot. Although five of the houses are already built, these structures are only part of all amenities required to make those houses habitable. Unresolved issues specifically regarding those five houses include ensuring adequate street width, an emergency vehicle turnaround area, sewer system design, drainage, and other matters which demonstrate even the five-house project is not yet complete. As in *Hixon*, an EIR can consider the cumulative environmental impacts of the first five houses on Woodstock Road together with the rest of Arviv's proposed project.

In short, Arviv has failed to demonstrate any part of his proposed project should be immune from environmental scrutiny.

III. *Arviv Had Adequate Notice the Commission Might Require an EIR for the Project as a Whole.*

Arviv claims he was sandbagged into believing the hearings before the Commission would be nothing more than a "pro forma" denial of the appeals. He claims he thought the appeals only concerned design matters regarding the two-house project and was thus utterly unprepared to respond to the public's and Commission's environmental concerns. Arviv claims because of the City's consistent approvals of his projects he "was lulled into a false sense of security that the hearings would not involve environmental matters, much less significant ones."

Given the circumstances of this case, it is understandable Arviv may have come to expect City approvals. However, that is not the same as saying he had inadequate notice an EIR might be required once the City realized his construction plans included much more than the two-house, allegedly categorically exempt, project.[27]

---

[25]*Hixon v. County of Los Angeles, supra*, 38 Cal.App.3d 370, 378.

[26]*Hixon v. County of Los Angeles, supra*, 38 Cal.App.3d 370, 379.

[27]Even the language on the application for an environmental exemption makes clear a preliminary clearance is nevertheless subject to review. The application states: "THE APPLICANT CERTIFIES THAT HE OR SHE UNDERSTANDS THE FOLLOWING: Completion of this form by an employee of the City constitutes *only a staff recommendation* that an exemption from

The appeals raised not only design issues, but environmental ones as well, including soil problems, grading problems, rockslides and mud slides and violations of height limitations, among other things. Comment letters received in July 2000 pointed out numerous environmental impacts, pointed out the inadequacies in the circulating MND for the 14 houses on Leicester, and recommended a full EIR be prepared. At the hearing in July 2000, the primary focus was on environmental issues regarding all of the proposed houses, and not only the two-house project formally appealed. Instead of ruling on the matter, the Commission chose to continue the hearing to include these newly raised issues. Prior to the continued November hearing residents and homeowners associations again challenged the MND's for the Woodstock Road and Leicester Drive houses. Again, they requested an EIR to analyze the cumulative environmental effects from the entire project.

The discussion at the July hearing plus the numerous comment letters and responses placed Arviv fully on notice environmental review of his project would also be the key issue at the continued November hearing. After the July hearing Arviv had at minimum three months to prepare whatever responses or evidence he thought appropriate to present at the hearing.

Nevertheless, Arviv likens his situation to the situation in *Cohan v. City of Thousand Oaks*.[28] In *Cohan* the city council appealed a commission's decision to itself, without authority to do so, and without specifying reasons. Then at the public hearing council members subjected the developers to "wide-ranging concerns in an impromptu fashion."[29] The appellate court found the city's appeal to itself illegal under its municipal code and further found the city's failure to issue findings or a written resolution until the developers filed their petition for writ of mandate violative of the developers' due process rights. "As real estate developers, appellants took the risk that their proposed project may not be approved or, if approved, may be severely conditioned. They may even incur the risk of a seemingly unfair decision. However, they should not be subjected to the blatant disregard of

---

CEQA be granted. A Notice of Exemption is only effective if, after public review and any required public hearings, it is adopted by the City agency having final jurisdiction (including any appeals) over the project application. If a CEQA exemption is found inappropriate preparation of a Negative Declaration or Environmental Impact Report will be required. IF THE INFORMATION SUBMITTED BY THE APPLICANT IS INCORRECT OR INCOMPLETE SUCH ERROR OR OMISSION COULD INVALIDATE ANY CITY ACTIONS ON THE PROJECT, INCLUDING CEQA FINDINGS." (Italics added.)

[28] *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547 [35 Cal.Rptr.2d 782].
[29] *Cohan v. City of Thousand Oaks, supra*, 30 Cal.App.4th 547, 557.

their due process rights. The Council simply submitted to the roar of the crowd."[30]

The present case bears no factual similarities to those found in *Cohan*. As noted, the specific issues appealed concerned environmental as well as design concerns. By the time of the November, and crucial, hearing Arviv was fully apprised his entire project was under scrutiny for its potential cumulative environmental impacts and thus would be the key, and likely only, issue at the hearing. Arviv was also aware once interested parties learned of the true scope of his intended development, they had consistently urged the City as well as the Commission to require a full environmental review of the entire project.

In short, Arviv's claimed lack of notice is not persuasive.

### DISPOSITION

The judgment is affirmed. Each side to bear its own costs of appeal.

Woods, J., and Perluss, J., concurred.

---

[30]*Cohan v. City of Thousand Oaks, supra,* 30 Cal.App.4th 547, 557, 561.