181 Cal.App.4th 521 (2010)
SAVE THE PLASTIC BAG COALITION, Plaintiff and Respondent,
v.
CITY OF MANHATTAN BEACH, Defendant and Appellant.
No. B215788.
Court of Appeals of California, Second District, Division Five.
January 27, 2010.
*525 Robert V. Wadden, Jr., City Attorney, for Defendant and Appellant.
Stephen L. Joseph for Plaintiff and Respondent.

*526 OPINION
TURNER, P. J. 

I. INTRODUCTION
Defendant, the City of Manhattan Beach (the city), appeals from a judgment issuing a peremptory writ of mandate. The city had issued a negative declaration under the California Environmental Quality Act in connection with an ordinance. (Pub. Resources Code,[1] § 21000 et seq.) The ordinance prohibited certain retailers, including grocery stores, from providing plastic bags to customers at the point of sale. The trial court vacated the ordinance and disallowed reenactment pending an environmental impact report. The trial court found substantial evidence supported a fair argument the ordinance may cause increased use of paper bags, which may have a significant negative impact on the environment, therefore an environmental impact report was required. We agree. Accordingly, we affirm the judgment. We do not resolve the question of the ultimate merits of whether the plastic bag distribution ban should be implemented. All we are saying is that an environmental impact report must be prepared given that it can be fairly argued based on substantial evidence in the record that the ordinance may have a significant environmental impact. We emphasize that the fair argument test sets a low threshold for preparation of an environmental impact report and reflects a preference for resolving doubts in favor of environmental review.

II. BACKGROUND

A. The Ordinance
On July 15, 2008, the city adopted ordinance No. 2115, which prohibits the use of plastic bags in specified circumstances. As set forth in section 1 of the ordinance, the city council found: "A. As a coastal city Manhattan Beach has a strong interest in protecting the marine environment an element which contributes to the unique quality of life in the City. [¶] B. Plastic and paper bags each have negative impacts on the environment. It is well known that paper bags require more energy to manufacture and recycle and generate effluent during these processes. It is also known that paper bags are bulkier and heavier than plastic bags. [¶] C. However a primary and significant problem with plastic bags is that they do not biodegrade and are extremely light and easily caught in the wind. In a coastal city like Manhattan Beach even plastic bags which are properly discarded can find their way into the *527 marine environment where they do not break down and essentially remain indefinitely. [¶] D. The Pacific Ocean contains a huge accumulation of debris known as the `Great Pacific Garbage Patch' which consists mostly of plastic debris. Some scientists estimate the density of plastic in this garbage patch as one million pieces of plastic per square mile. While plastic does not bio-degrade it does `photo-degrade' breaking down into smaller pieces which can make their way into the food chain [via] such animals as jellyfish. [¶] E. While the exact numbers are unknown there are many reported instances of marine animals being injured or dying from ingesting or choking on plastic debris in the ocean. It is reasonable to conclude from such information that the presence of plastic debris in the ocean provides a hazard for marine life. [¶] F. Because there is a strong possibility that plastic bags discarded in Manhattan Beach can end up in the ocean where they will last indefinitely and create an aesthetic blight and potential hazard to marine life (and paper bags will not do so because they biodegrade and are less likely to be blown out to sea) it is in the best interests of the public health, safety and welfare to adopt the proposed ban on distribution of plastic bags at point of sale within the boundaries of the City of Manhattan Beach. [¶] G. The City Council of the City of Manhattan Beach conducted a noticed public hearing regarding the project at their regular scheduled meeting of July 1, 2008. The public hearing was advertised pursuant to applicable law and testimony was invited and received. [¶] H. An Initial Environmental Study was prepared in compliance with the provisions of the California Environmental Quality Act. Based upon this study it was determined that the project is not an action involving any significant impacts upon the environment, and a Negative Declaration was prepared and is hereby adopted. [¶] I. The proposed amendments will have no negative impact on Fish and Game resources pursuant to Section 21089(b) of the Public Resources Code." The ordinance added chapter 5.88, Environment Regulations, section 5.88.010 to the Manhattan Beach Municipal Code providing in part: "No Affected Retail Establishment, Restaurant, Vendor or Non-Profit Vendor shall provide Plastic Carry-Out Bags to customers at the point of sale. Reusable Bags and Recyclable Paper Bags are allowed alternatives." "Recyclable Paper Bag" was defined as, "[A] paper bag that meets all of the following requirements: (1) contains no old growth fiber; (2) is 100 [percent] recyclable overall and contains a minimum of 40 [percent] post-consumer recycled content; and (3) displays the words `Reusable' and `Recyclable' in a highly visible manner on the outside of the bag."

B. The Initial Study
The city's goal, as reflected in the ordinance, is to protect the marine environment and marine life. That concern is discussed in the initial study as follows: "The project consists of the adoption of an ordinance which would ban plastic shopping bags, thereby decreasing the prevalence of plastic bag *528 litter in the marine environment in and near the City.... [¶] Plastic debris is a major pollutant of coastal waters. In the Pacific Ocean there exists a huge accumulation of debris know[n] as the `Great Pacific Garbage Patch' or `Plastic Soup.' This is an accumulation of mostly plastic debris drawn by currents to accumulate in the area of the northern Pacific Ocean known as the `North Pacific Gyre.' Some scientists estimate the density of the plastic in this region at one million pieces of plastic per square mile. Plastic does not biodegrade so over the past two decades this mass has been growing. Some studies show that plastic photo-degrades breaking into smaller pieces and making its way into the food chain via animals such as jellyfish. [¶] While it may be difficult to ascertain the exact numbers of marine life which perish every year due to ingestion of or choking on plastic debris there are numerous anecdotal accounts of marine life being discovered with plastic debris in their stomachs or clogging their breathing apparatus. [¶] Reducing the use of plastic bags in [the city] will have only a modest positive impact on the migration of plastic refuse into the ocean. However, as a coastal City the imposition of the ban is likely to have some modest impact on improving water quality and removing a potential biohazard from the marine environment."
On the basis of its initial study, the city found the plastic bag distribution ban could not have a significant effect on the environment. The city acknowledged the ordinance may result in greater paper bag use, which could have negative environmental effects including increased powerplant, paper mill and recycling plant emissions; traffic involved in shipping paper bags to retail establishments; and emissions from trucks carrying heavier, bulkier paper bags. The initial study also found reducing the use of plastic bags in the city would have only a modest positive impact on the migration of plastic refuse into the ocean. The initial study concluded, however, that there would be no environmental impact as to aesthetics, agriculture, biological and cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning, mineral resources, noise, population and housing, fire and police protection, schools and parks, recreation, and utilities and service systems other than landfills. The initial study further found less than significant environmental impact with respect to air quality, traffic and landfill capacity because the increased use of paper bags would be relatively small with minimal or no increase in pollutants generated from production and recycling and increase in truck traffic: plastic bag bans imposed by political subdivisions in California are not widespread; all paper bags used at point of sale in the city would be composed of at least 40 percent recyclable material; the city's population is only 33,852; the ordinance does not ban all use of plastic bags, only their distribution at point of sale; only 11.2 percent of the city is zoned for commercial use; there are only 217 licensed retail establishments in the city that might use plastic bags; there are only two *529 supermarkets, three drugstores, and one Target store in the city known to be high-volume users of plastic bags; many restaurants and most fastfood outlets use paper bags for takeout orders; plastic bags would not be replaced by paper bags on a one-to-one ratio; a larger portion of paper bags is recycled than plastic; the city represents a small proportion of regional landfill users; and in light of anticipated education efforts, increased publicity and growing public concern for the environment, it was expected that at least some percentage of plastic bags will be replaced by reusable bags rather than paper bags.

C. The Writ Petition
On August 12, 2008, shortly after the ordinance was adopted, plaintiff, Save the Plastic Bag Coalition, filed its verified mandate petition and a declaratory relief request. Plaintiff alleged it is an unincorporated association of plastic bag manufacturers, distributors, and others. Plaintiff further alleged it was formed to counter myths, misinformation and exaggerations about plastic bags by various groups purporting to promote environmental quality and to require governmental agencies to comply with the California Environmental Quality Act before banning plastic bags. Plaintiff averred there was no evidence plastic bags were a continuing significant problem for marine animals; the ordinance will inevitably result in increased use of paper bags, which have greater significant negative environmental effects than plastic bags; the use of paper bags increases consumption of nonrenewable primary energy and water; greater paper bag use increases emission of climate changing greenhouse gases, acid rain, negative air quality, water body eutrophication[2] and solid waste production; and paper bags degrade in landfills while plastic bags do not, but decomposing paper produces methane, a potent greenhouse gas. Plaintiff concluded that if the city were required to prepare an environmental impact report, the city council and the public would know the true facts about the ways in which and the extent to which paper bags are worse for the environment and that banning plastic bags would not have any material effect on the environment.

*530 D. The Cited Reports
The parties cited to and relied on several reports in the administrative record discussing the environmental impacts of plastic and paper bag use. We summarize those reports below.

1. The Scottish Government Report
In 2005, a report entitled, Proposed Plastic Bag LevyExtended Impact Assessment was produced for and published by the Scottish government. The report was commissioned in response to a bill in the Scottish Parliament to impose an "environmental levy" on lightweight plastic carrier bags as provided by shops and retail outlets. The bill was intended to cover "all bags made partially or completely of plastic" except for those used for directly packing fresh meat, fish, fruit and other foods. The preparers of the report summarized the arguments pro and con: "Advocates of a levy on plastic bags cite the main benefits as being reduced littering (including marine litter), reduced use of resources and energy, lower pollutant emissions and increased public awareness of environmental issues. [¶] Opponents argue that lightweight plastic carrier bags are hygienic, convenient and durable, that they are often reused for other purposes, that they form only a small part of the litter stream and that they have a lower overall environmental impact than paper bags. They also claim that a levy would impact unfairly on poorer households and would lead to job losses in Scotland (from reduced plastic bag manufacturing and importing)." The study considered a range of scenarios, including a levy on both plastic and paper bags. The study took into account an Irish plastic bag levy and voluntary schemes in the United Kingdom along with results from lifecycle analysis studies performed in France and Australia.
The Scottish report considered eight indicators of environmental impact: nonrenewable energy consumption; water consumption; greenhouse gas emissions; acid rain; air quality; eutrophication of water bodies; solid waste production; and risk of litter. As compared to a lightweight plastic carrier bag (at a constant of 1.0), a paper bag was found to cause: 1.1 times more nonrenewable energy consumption; 4.0 times the consumption of water; 3.3 times the emission of greenhouse gases; 1.9 times more acid rain; 1.3 times ground level ozone formation; 1.4 times the eutrophication of water bodies; and 2.7 times the solid waste production. Only with respect to risk of litter did the paper bag (0.2) fare better than the plastic bag (1.0). The preparers concluded a plastic bag tax was likely to increase the use of paper bags as well as reusable bags; due to their physical properties and the impact of their manufacture and transportation, and relative to plastic bag use, use of paper bags had a greater impact on the environment in each of the eight categories except risk of litter; a plastic bag tax would have a negative effect on the *531 environment in terms of water consumption and eutrophication; but because of the tradeoff between negative environmental impacts from increased paper bag use and the positive environmental impacts from reduced plastic bag use, the overall environmental effect of a plastic bag levy would remain very similar to no levy at all; and only if a tax were also placed on paper bags would the negative effects on the environment as measured by the eight indicators be significantly reduced.
The preparers summarized their main conclusions: "The analysis shows that there would be an environmental benefit for some of the indicators depending on what consumers choose to use were a levy to be introduced. [¶] ... [T]he biggest environmental improvement is seen ... where paper bags are included in the levy. These occur for all environmental indicators. [¶] ... In scenarios where paper bags are excluded [from the levy], the environmental benefits of reduced plastic bag usage are negated for some indicators by the impacts of increased paper bag usage. This is because a paper bag has a more adverse impact than a plastic bag for most of the environmental issues considered. Areas where paper bags score particularly badly include water consumption, atmospheric acidification (which can have effects on human health, sensitive ecosystems, forest decline and acidification of lakes) and eutrophication of water bodies (which can lead to growth of algae and depletion of oxygen). [¶] ... [¶] ... Paper bags are anywhere between six and ten times heavier than lightweight plastic carrier bags and, as such, require more transport and its associated costs. They would also take up more room in a landfill if they were not recycled. [¶] ... The analysis demonstrates that ... paper bags should be included to maximise the potential environmental benefit of the levy."

2. The Boustead Report
In 2007, an entity called the Progressive Bag Alliance contracted with Boustead Consulting & Associates (Boustead) to conduct lifecycle (manufacture, distribution, disposal) assessments with respect to three types of grocery bags: plastic; compostable plastic; and paper made of 30 percent recycled fibers. The plastic bag was a traditional polyethylene grocery bag. The study found in part: "The results show that single use plastic bags made from polyethylene have many advantages over both compostable plastic bags made from EcoFlex and paper bags made with a minimum of 30 [percent] recycled fiber.

*532
----------------------------------------------------------------------------
 Impact Summary of Various Bag Types
 ---------------------------------------------------
 (Carrying Capacity Equivalent to 1000 Paper Bags)
----------------------------------------------------------------------------
 Paper Compostable Polyethylene
 (30% Recycled Plastic
 Fiber)
----------------------------------------------------------------------------
Total Ene[r]gy Used (MJ) 2622 2070 763
----------------------------------------------------------------------------
Fossil Fuel Use (kg) 23.2 41.5 14.9
----------------------------------------------------------------------------
Municipal Solid Waste (kg) 33.9 19.2 7.0
----------------------------------------------------------------------------
Greenhouse Gas Emissions
(C02 Equiv. Tons) 0.08 0.18 .04
----------------------------------------------------------------------------
Fresh Water Usage (Gal) 1004 1017 58
----------------------------------------------------------------------------

When compared to 30 [percent] recycled fiber paper bags, polyethylene grocery bags use less energy in terms of fuels for manufacturing, less oil, and less potable water. In addition, polyethylene plastic grocery bags emit fewer global warming gases, less acid rain emissions, and less solid wastes. The same trend exists when comparing the typical polyethylene grocery bag to grocery bags made with compostable plastic resinstraditional plastic grocery bags use less energy in terms of fuels for manufacturing, less oil, and less potable water, and emit fewer global warming gases, less acid rain emissions, and less solid wastes. [¶] The findings of this study were peer reviewed by an independent third party with significant experience in life cycle assessments to ensure that the results are reliable and repeatable. The results support the conclusion that any decision to ban traditional polyethylene plastic grocery bags in favor of bags made from alternative materials (compostable plastic or recycled paper) will result in a significant increase in environmental impacts across a number of categories from global warming effects to the use of precious potable water resources. As a result, consumers and legislators should re-evaluate banning traditional plastic grocery bags, as the unintended consequences can be significant and long-lasting." The Boustead report concluded increased recycling, secondary usage, and keeping plastic bags out of the litter stream would appear to be more productive than a ban in reducing the overall environmental impact of plastic bag use.

3. The ULS Report
In April 2007, the Cty of San Francisco imposed a ban on supermarket and pharmacy distribution of plastic carryout bags at the point of sale. (S.F. Environment Code, ch. 17, §§ 1701-1709 [as of Jan. 27, 2010].) In response, the editors of The ULS (Use Less Stuff) Report examined four studies by others and developed their own conclusions, which they set forth in a March 28, 2008 report. The ULS Report found paper bags do not degrade or break down at a substantially faster rate than plastic bags; plastic bags generate fewer greenhouse gas emissions in production than uncomposted or composted paper bags; the production of plastic bags consumes less water than that needed to produce paper bags; a plastic bag's production and life cycle consumes less nonrenewable energy than a paper bag's; paper bags generate more solid waste than plastic bags; and "[a]fter four or more uses, reusable plastic bags are superior to all types of disposable bagspaper, polyethylene and compostable plasticacross all significant environmental indicators." (Fn. omitted.) The ULS Report concluded: "While paper and certain plastics may be biodegradable or compostable in specially designed industrial facilities, evidence indicates that this feature may be of little value in the effort to reduce waste ..." (underscoring omitted); "[t]he evidence does not support conventional wisdom that paper bags are a more environmentally sustainable alternative than plastic bags" (underscoring omitted); and "[w]hile the data appear to indicate that paper and compostable plastic bags may account for less litter, data also indicates that this finding is offset by the increased environmental impacts these bags produce versus traditional plastic bags ..." (underscoring omitted). With respect to legislation banning plastic bags, the ULS Report summarized: "Legislation designed to reduce environmental impacts and litter by outlawing grocery bags based on the material from which they are produced will not deliver the intended results. While some litter reduction might take place, it would be outweighed by the disadvantages that would subsequently occur (increased solid waste and greenhouse gas emissions).... [¶] ... [¶] ... [W]hen it comes to reducing the environmental and litter impacts of grocery and merchandise bags, the solution lies in a.) Minimizing the materials used to produce all types of bags, regardless of their composition, and b.) Building public awareness and motivation to reduce, reuse and recycle these bagsin that order." (Underscoring omitted.)

4. The Franklin Report
Franklin Associates, Ltd., prepared a June 1990 report entitled, Resource and Environmental Profile Analysis of Polyethylene and Unbleached Paper Grocery Sacks for The Council For Solid Waste Solutions. The report states it was prompted by concerns about decreasing landfill capacity and the solid packaging that accounted for "roughly one-third of the weight of the municipal solid waste" being landfilled. The study's stated purpose was to determine the energy and environmental impacts of polyethylene and paper grocery sacks. A "cradle-to-grave" methodology was employed to determine energy *534 and environmental impacts of plastic versus paper bags: "This methodology measures energy consumption and environmental emissions at each stage of a product's `life cycle,' beginning at the point of raw materials extraction from the earth and proceeding through processing, manufacturing, use, and final disposal, recycle, or reuse." The ratio of polyethylene sacks to paper sacks used was considered "crucial" to the results. Based on data collected from supermarket chains and other industry sources, the preparers settled on ratios of 1.5 to one and two to one polyethylene to paper, and the results were presented using those ratios. The report concluded: "Energy [¶] The energy requirements for the polyethylene grocery sacks are between 20 and 40 percent less than for paper sacks at zero percent recycling of both sacks. As recycling increases for both [bag types] at the 2 [polyethylene]:1 paper sack ratio, the energy requirements become equivalent at approximately a 60 percent recycling rate. At the 1.5 [polyethylene]:1 paper sack ratio, the polyethylene sack continues to require[] 23 percent less energy than paper even at 100 percent recycling. [¶] Environmental [¶] 1. Polyethylene sacks contribute between 74 and 80 percent less solid waste than paper sacks at zero percent recycling. Polyethylene sacks continue to contribute less solid waste than paper sacks at all recycling rates. [¶] 2. Atmospheric emissions for the polyethylene sack are between 63 and 73 percent less than for the paper sack at zero percent recycling. These lower impacts for the polyethylene sack continue throughout all recycling rates. [¶] 3. At zero percent recycling rate, the polyethylene sack contributes over 90 percent less waterborne wastes than the paper sack. This percent difference actually increases as the recycling rate for both grocery sacks increases. [¶] ... [¶] Recyclability [¶] Both [bag types] are recyclable. Manufacturing scrap and trim from the fabrication of the sacks are typically recycled. Postconsumer recycling for both of these sacks has not been significant. In the case of paper sacks, they are most typically recycled during the collection of old newspapers. For polyethylene sacks, efforts are usually concentrated on industrial scrap film[.] However, efforts have recently begun to collect both polyethylene and paper grocery sacks at the postconsumer level. [¶] Incineration Impacts [¶] On a per pound basis, polyethylene releases 2.75 times more energy upon incineration than unbleached paper. However, on an equal use basis, paper grocery sacks weigh 4 to 5 times more than polyethylene grocery sacks. Therefore, on an equivalent use basis, the paper sack has a greater potential for energy released from incineration than the polyethylene sack. The ash content per pound of unbleached paper is greater than that of polyethylene. Thus, even on an equivalent use basis, the paper sack has a greater potential for more ash from incineration than the polyethylene sack. [¶] Landfill Impacts [¶] Volume. The landfill volume occupied by the polyethylene sacks is 70 to 80 percent less than the volume occupied by paper sacks based on 10,000 uses.... [¶] Degradability. While some degradation occurs in landfills, little data exist regarding what materials degrade and the rate of decomposition. Therefore, *535 the degradability of both paper and polyethylene grocery sacks cannot be predicted. As a consequence, no estimates can be made regarding the potential for impact on landfill leachate or methane gas production."

5. The Los Angeles County Report
In April 2007, the Los Angeles County Board of Supervisors instructed county officials to investigate polyethylene plastic and paper bag consumption and the likely impact of an ordinance of the type proposed in San Francisco. The report's preparers reviewed and analyzed published studies from around the world in order to assess the ecological, environmental, and financial impacts of carry out bags. The preparers also surveyed grocery and retail stores, solid waste facilities and others and consulted public and environmental interest groups. The comprehensive report focused on the litter problem associated with plastic bags. The key findings were: "Plastic carryout bags have been found to significantly contribute to litter and have other negative impacts on marine wildlife and the environment. [¶] ... Biodegradable carryout bags are not a practical solution to this issue in Los Angeles County because there are no local commercial composting facilities able to process the biodegradable carryout bags at this time. [¶] Reusable bags contribute towards environmental sustainability over plastic and paper carryout bags. [¶] ... [and] Accelerating the widespread use of reusable bags will diminish plastic bag litter and redirect environmental preservation efforts and resources towards `greener' practices."

III. DISCUSSION

A. Standing
(1) The city argues plaintiff has no standing to bring this mandate proceeding because it lacks the required "beneficial interest"it is an association of plastic bag manufacturers who will be economically damaged by a ban on the dissemination of plastic bags. Plaintiff counters that it exists to respond to the misinformation, myths, and exaggerations that have been disseminated about the environmental impacts of plastic bag use. The public interest plaintiff asserts in this action is the need for an environmental impact report which addresses pollution, greenhouse gas emissions and the other negative impacts resulting from paper bag use. The trial court concluded plaintiff has standing. We agree. The relevant facts being undisputed, standing is a question of law subject to our independent review. (Martin v. Bridgeport Community Assn., Inc. (2009) 173 Cal.App.4th 1024, 1031-1032 [93 Cal.Rptr.3d 405]; Estate of Bowles (2008) 169 Cal.App.4th 684, 690 [87 Cal.Rptr.3d 122]; Bilafer v. Bilafer (2008) 161 Cal.App.4th 363, 368 [73 Cal.Rptr.3d 880]; but see Burrtec Waste Industries, Inc. v. City of Colton *536 (2002) 97 Cal.App.4th 1133, 1137 [119 Cal.Rptr.2d 410] [substantial evidence standard of review applies]; Berclain America Latina v. Baan Co. (1999) 74 Cal.App.4th 401, 404-405 [87 Cal.Rptr.2d 745] [same].) Standing requirements are liberally construed in cases under the California Environmental Quality Act. (Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017]; Bakersfield Citizens for Local Control v. City of Bakersfield (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203].)
(2) A mandate petition must be brought by a "beneficially interested" party. (Code Civ. Proc., § 1086.) Our Supreme Court has held, "The requirement that a petitioner be `beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (Carsten v. Psychology Examining Com. (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276]; accord, Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection (2008) 44 Cal.4th 459, 479 [80 Cal.Rptr.3d 28, 187 P.3d 888]; see Waste Management of Alameda County, Inc. v. County of Alameda (2000) 79 Cal.App.4th 1223, 1229 [94 Cal.Rptr.2d 740] [for-profit corporation's commercial and competitive interest in having its competitor incur California Environmental Quality Act costs was not "within the zone of interests [the act] was intended to preserve or protect"].) But in Bd. of Soc. Welfare v. County of L. A. (1945) 27 Cal.2d 98, 100-101 [162 P.2d 627], our Supreme Court recognized an exception to the general rule that a writ of mandate will issue only to a person who is beneficially interested. Our Supreme Court held: "`[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced....'" (Ibid.; accord, Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra, 44 Cal.4th at p. 479 ["a well-established exception to the beneficial interest rule"]; Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610].) The Supreme Court has subsequently described this as "the `public right/public duty' exception" to the requirement of beneficial interest for a writ of mandate. (Green v. Obledo (1981) 29 Cal.3d 126, 145 [172 Cal.Rptr. 206, 624 P.2d 256] [proper calculation of welfare benefits]; see V. S. v. Allenby (2008) 169 Cal.App.4th 665, 667-668 [87 Cal.Rptr.3d 143] [same].) Our Supreme Court has held: "The exception promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right. ([Bd. *537 of Soc. Welfare v. County of L. A., supra, 27 Cal.2d] at p. 100.)" (Green v. Obledo, supra, 29 Cal.3d at p. 144.)
(3) In its writ petition, plaintiff describes itself as an unincorporated association of plastic bag manufacturers, distributors and others, including three companies that supply plastic bags to city businesses. As noted, plaintiff states it was formed to counter misinformation about the effect of plastic bag usage on the environment and to require government agencies to prepare environmental impact reports before banning plastic bags so that their decisions are based on accurate information. The interest plaintiff asserts in its writ petition is not a commercial one. (Regency Outdoor Advertising, Inc. v. City of West Hollywood (2007) 153 Cal.App.4th 825, 833 [63 Cal.Rptr.3d 287]; Burrtec Waste Industries, Inc. v. City of Colton, supra, 97 Cal.App.4th at p. 1138.) This is not a case in which the plaintiff's interest is purely commercial and competitive. (Compare Waste Management of Alameda County, Inc. v. County of Alameda, supra, 79 Cal.App.4th at p. 1229 with Burrtec Waste Industries, Inc. v. City of Colton, supra, 97 Cal.App.4th at pp. 1138-1139.) Further, a public right and duty are at stake in this case. Maintaining a quality environment is a matter of statewide concern. (§ 21000, subd. (a); Friends of Sierra Madre v. City of Sierra Madre (2001) 25 Cal.4th 165, 183-184 & fn. 10 [105 Cal.Rptr.2d 214, 19 P.3d 567]; Bozung v. Local Agency Formation Com., supra, 13 Cal.3d at pp. 275-276 & fn. 12; see Napa Valley Wine Train, Inc. v. Public Utilities Com. (1990) 50 Cal.3d 370, 384-385 [267 Cal.Rptr. 569, 787 P.2d 976] (dis. opn. of Mosk, J.), abrogated on another point in § 21080.04, subd. (b).) The public has a right to a quality environment. (§§ 21000, 21001.) (4) Government agencies have an obligation to protect the environment and to make fully informed decisions about projects that may significantly affect the environment. (§§ 21000, 21001, 21002; In re Bay-Delta etc. (2008) 43 Cal.4th 1143, 1162 [77 Cal.Rptr.3d 578, 184 P.3d 709]; Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) Our Supreme Court has held: (5) "[The California Environmental Quality Act] is a comprehensive scheme designed to provide long-term protection to the environment. ([§ 21001].) In enacting [the act], the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. (§ 21000, subd. (g); see generally, Sierra Club v. State Bd. of Forestry (1994) 7 Cal.4th 1215, 1229 [32 Cal.Rptr.2d 19, 876 P.2d 505] . . .; Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] ...; Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn. (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029].) [The California Environmental Quality Act] is to be interpreted `to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' *538 (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049][, disapproved on another point in Kowis v. Howard (1992) 3 Cal.4th 888, 896-897 [12 Cal.Rptr.2d 728, 838 P.2d 250]].)" (Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) (6) When a government agency fails or refuses to comply with the California Environmental Quality Act, a writ of mandamus is the appropriate action. (§ 21168.9; Friends of Sierra Madre v. City of Sierra Madre, supra, 25 Cal.4th at pp. 194-196; Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; Bd. of Soc. Welfare v. County of L. A., supra, 27 Cal.2d at pp. 100-101.)
We conclude plaintiff has standing to seek a writ of mandate pursuant to the public right/duty exception to the beneficial interest requirement. (Green v. Obledo, supra, 29 Cal.3d at pp. 144-145; Bd. of Soc. Welfare v. County of L. A., supra, 27 Cal.2d at pp. 100-101; see Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra, 44 Cal.4th at p. 479; Common Cause v. Board of Supervisors, supra, 49 Cal.3d at p. 439.) Plaintiff seeks to procure the enforcement of the city's public duty to prepare an environmental impact report. Plaintiff's immediate goal is to require public agencies to consider the impact of plastic bag usage on the environment as compared to other alternatives. That some of its members might benefit commercially if the city, after preparing an environmental impact report, chose not to impose a plastic bag distribution ban does not deny plaintiff standing.

B. Project
(7) Preliminarily, we address whether the ordinance at issue may not be a project within the meaning of the California Environmental Quality Act. The parties have not raised this issue. In fact, Manhattan Beach City Attorney Robert V. Wadden, Jr., commendably agrees this is a project. At oral argument, Mr. Wadden stated: "Clearly [the California Environmental Quality Act] applies .... We never argued that it wasn't a project. I think it clearly is a project ...." In any event, a "project" is defined in section 21065: "`Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, which is any of the following: [¶] (a) An activity directly undertaken by any public agency." Our Supreme Court has held: "Whether an activity constitutes a project subject to [the California Environmental Quality Act] is a categorical question respecting whether the activity is of a general kind with which [the act] is concerned, without regard to whether the activity will actually have environmental impact.... Whether an activity is a project is an issue of law that can be decided on undisputed data in the record on *539 appeal. (Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 794-795 [187 Cal.Rptr. 398, 654 P.2d 168], questioned on another point in Board of Supervisors v. Local Agency Formation Com. (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198].)" (Muzzy Ranch Co. v. Solano County Airport Land Use Com. (2007) 41 Cal.4th 372, 381-382 [60 Cal.Rptr.3d 247, 160 P.3d 116].) Here, a public agencythe citydirectly undertook an activityadopting an ordinancewhich, as discussed below, may cause a direct or reasonably foreseeable indirect physical change in the environment. (8) And our Supreme Court has applied the California Environmental Quality Act when, as here, a public agency enacts an ordinance. (Friends of Sierra Madre v. City of Sierra Madre, supra, 25 Cal.4th at pp. 182-191 [historic preservation ordinance]; No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 73-75 [118 Cal.Rptr. 34, 529 P.2d 66] [ordinances permitting oil company to sink test wells].)

C. Fair Argument
(9) Here, as noted above, the city issued an initial study and a negative declaration. Compliance with the California Environmental Quality Act is a three-tiered process. (California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist. (2009) 178 Cal.App.4th 1225, 1237-1238 [101 Cal.Rptr.3d 81]; Architectural Heritage Assn. v. County of Monterey (2004) 122 Cal.App.4th 1095, 1100-1101 [19 Cal.Rptr.3d 469].) As the Court of Appeal explained in Architectural Heritage Assn.: "`The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether [the California Environmental Quality Act] applies to a proposed activity. (Guidelines,[[3]] §§ 15060, 15061.)' (Davidon Homes v. City of San Jose [(1997)] 54 Cal.App.4th [106,] 112 [62 Cal.Rptr.2d 612].) `If the agency finds the project is exempt from [the California Environmental Quality Act] under any of the [statutory] exemptions, no further environmental review is necessary.' (Id. at p. 113.) `If, however, the project does not fall within any exemption, the agency must proceed with the second tier and conduct an initial study. (Guidelines, § 15063.)' (Ibid.) [¶] The second tier of the process, the initial study, serves several purposes. (Guidelines, § 15063, subd. (c).) One purpose is to inform the choice between a negative declaration and an environmental impact report .... (Id., subd. (c)(1); Leonoff v. Monterey County Bd. of Supervisors (1990) 222 Cal.App.3d 1337, 1346 [272 Cal.Rptr. 372].) Another of the initial study's purposes is to eliminate unnecessary environmental impact reports. (Guidelines, § 15063, subd. (c)(7).) [¶] `[The California Environmental Quality Act] excuses the preparation of an [environmental impact report] and allows the use of a negative declaration when an initial study shows that there is no substantial *540 evidence that the project may have a significant effect on the environment.' (San Bernardino Valley Audubon Society v. Metropolitan Water Dist. (1999) 71 Cal.App.4th 382, 389-390 [83 Cal.Rptr.2d 836], citing Guidelines, § 15070; see also §§ 21064, 21080, subd. (c); Leonoff v. Monterey County Bd. of Supervisors, supra, 222 Cal.App.3d at p. 1347.) [¶] ... [¶] If the project does not qualify for a negative declaration . . ., `the third step in the process is to prepare a full environmental impact report . . . .' (Davidon Homes v. City of San Jose, supra, 54 Cal.App.4th at p. 113, citing §§ 21100 and 21151, and Guidelines, §§ 15063, subd. (b)(1), and 15080; Gentry v. City of Murrrieta [(1995)] 36 Cal.App.4th [1359,] 1372 [43 Cal.Rptr.2d 170].)" (Architectural Heritage Assn. v. County of Monterey, supra, 122 Cal.App.4th at pp. 1100-1101.)
(10) Our Supreme Court has held, "[T]he Legislature intended the [California Environmental Quality Act] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (Friends of Mammoth v. Board of Supervisors, supra, 8 Cal.3d at p. 259; accord, Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra, 41 Cal.4th at p. 381.) An environmental impact report is the principal means by which the act's goals are accomplished. (Friends of Mammoth, at p. 259; accord, Muzzy Ranch Co., at p. 381.) The Supreme Court has held: "To achieve the objectives of [the California Environmental Quality Act], the Legislature has mandated the preparation and consideration of an [environmental impact report] before any public agency approves a project that is not statutorily exempt unless the lead agency issues a negative declaration, i.e., a declaration that the proposed project will not have a significant effect on the environment. (Pub. Resources Code, §§ 21064, 21080.1, 21082.2.) The purpose of an [environmental impact report] is to inform the agency and the public, in detail, about the effect the project is likely to have on the environment and the ways available to minimize that impact. (Pub. Resources Code, § 21061.)" (Friends of Sierra Madre v. City of Sierra Madre, supra, 25 Cal.4th at pp. 184-185, fns. omitted.) The environmental impact report is the primary means of achieving the objectives of the California Environmental Quality Act. (City of Marina v. Board of Trustees of California State University (2006) 39 Cal.4th 341, 359 [46 Cal.Rptr.3d 355, 138 P.3d 692]; Laurel Heights Improvement Assn. v. Regents of University of California, supra, 47 Cal.3d at p. 392.)
(11) The threshold requirement for preparation of an environmental impact report is low; it reflects a preference for resolving doubts in favor of environmental review. (County Sanitation Dist. No. 2 v. County of Kern (2005) 127 Cal.App.4th 1544, 1579 [27 Cal.Rptr.3d 28]; Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1316-1317 [8 Cal.Rptr.2d 473].) Our Supreme Court has explained, "[S]ince the preparation of an [environmental impact report] is the key to environmental protection under [the California *541 Environmental Quality Act], accomplishment of the high objectives of that act requires the preparation of an [environmental impact report] whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact." (No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at p. 75; accord, Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency (2005) 134 Cal.App.4th 598, 609 [36 Cal.Rptr.3d 249]; Sierra Club v. County of Sonoma, supra, 6 Cal.App.4th at p. 1316; § 21080, subd. (d) ["If there is substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment, an environmental impact report shall be prepared."].) Stated differently, a public agency should not file a negative declaration if there is substantial evidence supporting a fair argument the project may have a significant effect on the environment. (Leonoff v. Monterey County Bd. of Supervisors, supra, 222 Cal.App.3d at p. 1348.) Pursuant to Guidelines section 15064, "(a) Determining whether a project may have a significant effect plays a critical role in the [California Environmental Quality Act] process. [¶] (1) If there is substantial evidence, in light of the whole record before a lead agency, that a project may have a significant effect on the environment, the agency shall prepare a draft [environmental impact report]. [¶] ... [¶] (b) The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." "Environment" is broadly defined as "the physical conditions [that] exist within the area [that] will be affected by a proposed project...." (§ 21060.5; see also Guidelines § 15360 ["The area involved shall be the area in which significant effects would occur either directly or indirectly as a result of the project."].) (Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra, 41 Cal.4th at p. 387.) A "significant effect on the environment" means "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see also Guidelines § 15382 ["a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise ..."].) Guidelines section 15384, subdivision (a) defines "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (12) The burden is on the plaintiff to demonstrate the existence of substantial evidence supporting a fair argument of significant environmental impact. (Architectural Heritage Assn. v. County of Monterey, supra, 122 Cal.App.4th at p. 1112; League for Protection of Oakland's etc. Historic Resources v. City of Oakland (1997) 52 Cal.App.4th 896, 904 [60 Cal.Rptr.2d 821].)
*542 (13) Moreover, as the Court of Appeal has explained: "[I]f a local agency is required to secure preparation of an [environmental impact report] `whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact' (No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at p. 75; italics added), then an agency's adoption of a negative declaration is not to be upheld merely because substantial evidence was presented that the project would not have such impact. The trial court's function [and ours] is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed `fair argument' could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an [environmental impact report] and adopt a negative declaration, because it could be `fairly argued' that the project might have a significant environmental impact." (Friends of "B" Street v. City of Hayward (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514].) And if any aspect of the project may result in a significant environmental impact, an environmental impact report is required, even if the overall effect of the project is beneficial. (Guidelines, § 15063, subd. (b)(1); see County Sanitation Dist. No. 2 v. County of Kern, supra, 127 Cal.App.4th at p. 1580.)
The present petition, which challenges a public agency's legislative action, is subject to review under section 21168.5. (Friends of Sierra Madre v. City of Sierra Madre, supra, 25 Cal.4th at p. 172, fn. 2; Western States Petroleum Assn. v. Superior Court, supra, 9 Cal.4th at pp. 566-567; County Sanitation Dist. No. 2 v. County of Kern, supra, 127 Cal.App.4th at pp. 1577-1578.) Section 21168.5 states: "In any action or proceeding, other than an action or proceeding under section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." The Court of Appeal has held and it is well-established that: "The trial court's function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed `fair argument' could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an [environmental impact report] and adopt a negative declaration, because it could be `fairly argued' that the project might have a significant environmental impact. Stated another way, if the trial court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required [environmental impact report], the agency's action is to be set aside *543 because the agency abused its discretion by failing to proceed `in a manner required by law.' (Pub. Resources Code, § 21168.5.)" (Friends of "B" Street v. City of Hayward, supra, 106 Cal.App.3d at p. 1002, cited with approval in Laurel Heights Improvement Assn. v. Regents of University of California (1993) 6 Cal.4th 1112, 1134-1135 [26 Cal.Rptr.2d 231, 864 P.2d 502]; accord, e.g., Arviv Enterprises, Inc. v. South Valley Area Planning Com. (2002) 101 Cal.App.4th 1333, 1345-1346 [125 Cal.Rptr.2d 140]; Quail Botanical Gardens Foundation, Inc. v. City of Encinitas (1994) 29 Cal.App.4th 1597, 1602 [35 Cal.Rptr.2d 470]; Oro Fino Gold Mining Corp. v. County of El Dorado (1990) 225 Cal.App.3d 872, 880-881 [274 Cal.Rptr. 720].) Our task on appeal is the same as that of the trial court; our review is de novo. (Pocket Protectors v. City of Sacramento (2004) 124 Cal.App.4th 903, 928 [21 Cal.Rptr.3d 791]; San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus (1996) 42 Cal.App.4th 608, 617-618 [49 Cal.Rptr.2d 494]; Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra, 29 Cal.App.4th at p. 1602.) We defer to the agency's determination only when there are disputed credibility issues. (Mejia v. City of Los Angeles (2005) 130 Cal.App.4th 322, 332-333 [29 Cal.Rptr.3d 788]; Quail Botanical Gardens Foundation, Inc. v. City of Encinitas, supra, 29 Cal.App.4th at p. 1603; Bowman v. City of Berkeley (2004) 122 Cal.App.4th 572, 580-581 [18 Cal.Rptr.3d 814].)
Plaintiff asserts there is substantial evidence in the record to support a fair argument the ordinance may result in an increased use of paper bags, which may have a significant effect on the environment. As noted above, the city acknowledged the ordinance might lead to increased paper bag use. Further, the city acknowledged such increased use could have negative environmental effects including increased powerplant, paper mill and recycling plant emissions; traffic involved in shipping paper bags to retail establishments; and emissions from trucks carrying heavier, bulkier paper bags. But the city concluded such increased paper bag use and any corresponding environmental effect would be minimal or nonexistent because plastic bag bans are not widespread; the city's population is only 33,852 people; plastic bag use by residents generally would not be bannedonly their distribution at point of sale; paper bags distributed at point of sale would be minimally composed of 40 percent recyclable material; only 11.2 percent of the city was zoned for commercial use; the city has only 217 retail establishments that might use plastic bags; there were only two supermarkets, three drugstores, and one Target store known to be high-volume users of plastic bags; many restaurants and fastfood outlets use paper bags for takeout orders; paper bags have a higher capacity, so plastic bags would not be replaced by paper bags on a one-to-one ratio; a larger portion of paper bags is recycled than plastic; the city represents a small proportion of regional landfill users; and as a result of *544 education efforts and increased publicity together with public concern for the environment, it was expected some percentage of plastic bags will be replaced by reusable bags.
(14) We conclude it can be fairly argued based on substantial evidence in light of the whole record that the plastic bag distribution ban may have a significant effect on the environment. The five reports cited by the parties and summarized abovethe Scottish, Boustead, ULS, Franklin and Los Angeles County reportssupport the conclusions a plastic bag ban is likely to lead to increased use of paper as well as reusable bags; paper bags have greater negative environmental effects as compared to plastic bags; and the negative environmental effects include greater nonrenewable energy and water consumption, greenhouse gas emissions, solid waste production, and acid rain. It may be that the city's population and the number of its retail establishments using plastic bags is so small and public concern for the environment is so high that there will be little or no increased use of paper bags as a result of the ordinance and little or no impact on the environment affected by the ordinance. But the initial study contains no information about the city's actual experienceincluding, by way of example only: the number of plastic and paper bags consumed; recycling rates; the quantity of plastic bags disposed of in city trash; how the city disposes of its trash; whether plastic bags are a significant portion of litter found; how, when and in what quantities paper and plastic bags are delivered into the city; whether the city has a landfill that would be impacted by any increased paper bag use; whether there are recycling facilities or programs in the city or the surrounding area; and what the likely impact will be of a campaign urging recycling and reusable bag use. (15) There is no statutory exemption from compliance with the California Environmental Quality Act based on a city's geographical or population size. Nor have we found any decisional authority to the effect that a small city should not be required to expend its resources to comply with the California Environmental Quality Act when it believes its actions will have a positive effect on the environment. Nor can the California Environmental Quality Act's requirements be ignored when, as is often the case, the party seeking compliance has some personally beneficial motive in doing so. We conclude the city should have prepared an environmental impact report because the California Environmental Quality Act requires informed decisionmaking with respect to the environmental effects of a proposed project (In re Bay-Delta etc., supra, 43 Cal.4th at p. 1162; Citizens of Goleta Valley v. Board of Supervisors, supra, 52 Cal.3d at p. 564); preparation of an environmental impact report is the key to environmental protection (No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at p. 75; Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency, supra, 134 Cal.App.4th at p. 609); the fair argument test creates a low threshold for preparation of an environmental impact report (Sierra Club v. *545 County of Sonoma, supra, 6 Cal.App.4th at pp. 1316-1317; Oro Fino Gold Mining Co. v. County of El Dorado, supra, 225 Cal.App.3d at p. 881); and substantial evidence in light of the whole record supports a fair argument the plastic bag distribution ban may have a significant environmental effect.
Our dissenting colleague reasons there is no evidence other cities have prepared environmental impact reports in connection with plastic bag distribution bans, and asks, "Who would have thought to do so?" (Dis. opn., post, at p. 550.) While that point is not relevant to our decision in this case, we note for example that the City of Palo Alto entered into a July 2009 settlement agreement with the plaintiff here, Save the Plastic Bag Coalition (Save the Plastic Bag Coalition v. City of Palo Alto (Super. Ct. Santa Clara County, 2009, No. 1-09-CV-140463)), in which the City of Palo Alto agreed not to enact or adopt any further plastic bag ban, or amend any existing such law, until it completes and certifies an environmental impact report ( [as of Jan. 27, 2010]); the City of San Jose announced in October 2009 that it would be preparing an environmental impact report in connection with a single-use carryout bag ordinance ( [as of Jan. 27, 2010]); and Green Cities California is preparing a master environmental impact assessment for use by local governments seeking to restrict single-use plastic shopping bags (see [as of Jan. 27, 2010]).

IV. DISPOSITION
The judgment issuing a peremptory writ of mandate is affirmed. Plaintiff, Save the Plastic Bag Coalition, shall recover its costs on appeal from defendant, the City of Manhattan Beach.
Kriegiler, J., concurred.
MOSK, J., Dissenting. 
I respectfully dissent.
Requiring the small city of Manhattan Beach (City), containing a little over 33,000 people, to expend public resources to prepare an environmental impact report (EIR) for enacting what the City believes is an environmentally friendly ordinance phasing out the retail distribution (not use) of plastic carryout bags within the City and promoting the use of reusable bags (not paper bags)[1] stretches the California Environmental Quality Act (Pub. *546 Resources Code, § 21000 et seq.) (CEQA) and the requirements for an EIR to an absurdity. Virtually every act taken by government has some effect on the environment. Most acts are of some public interest or arouse controversy. The trial court's emphasis on public interest or controversy is misplaced because those factors do not mean the measure is environmentally significant so as to require an EIR.
This action to require an EIR was generated by the plastic bag industry for its economic interest,[2] even though it is the plastic bag that has caused environmental concerns. The Legislature has declared that "[o]n a global level, the production of plastic bags has significant environmental impacts each year...." (Stats. 2006, ch. 845, § 1.) The Legislature attributed to plastic bags the death of thousands of marine animals, litter, contamination of soil and waterways, entrance of contamination into the food chain, and use of millions of barrels of oil.[3] (Stats. 2006, ch. 845, § 1.) In Public Resources Code section 42253, the Legislature provided, "The manufacturer of a plastic carryout bag shall develop educational materials to encourage the reducing, reusing, and recycling plastic bags and shall make those materials available to stores required to comply with this chapter." That this ordinance to protect the environment specifically within the City is invalidated under an environmental statute is especially ironic in view of the state legislation promoting the use of reusable bags and recycling of clean carryout plastic bags. (Pub. Resources Code, § 42250 et seq.)
Notwithstanding that the City prepared a negative declaration, I have doubts that this ordinance even qualifies as a "project" under Public Resources Code section 21065.[4] A project is defined in that section as "an activity which may cause either a direct physical change in the environment, or a reasonably forseeable indirect physical change in the environment ...." "An activity that is not a `project' as defined in the Public Resources Code (see § 21065) and the CEQA Guidelines (see § 15378) is not subject to CEQA. (CEQA Guidelines, § 15060, subd. (c)(3).)" (Muzzy Ranch Co. v. Solano County Airport Land Use Com. (2007) 41 Cal.4th 372, 380 [60 Cal.Rptr.3d 247, 160 *547 P.3d 116].) I realize that the term "project" is supposed to be given a broad interpretation (Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora (2007) 155 Cal.App.4th 1214, 1222-1223 [66 Cal.Rptr.3d 645]), but to consider this ordinance a project requires that virtually all actions taken by a public agency be deemed projects. It is difficult to conceive of a public agency action that would not cause some theoretical "reasonably foreseeable indirect physical change in the environment." Do the kind and amount of supplies ordered by a public agency constitute a project? As with plastic or paper bags, the manufacture and distribution of such supplies inevitably will have some foreseeable environmental impact, as will disposing of the waste those supplies eventually will become. Will government publication of books and periodicals using paper, or the decision by a government agency not to go paperless, or policies to shift from cloth towels or hand blowers in restrooms to paper, or other measures that increase the use of paper constitute a project?[5] These impacts, as the ones in issue here, should not be deemed substantial enough for an EIR.
With regard to any assertion as to an admission by the City, is it important to read in full what the City actually said in several sections (that I have combined) in its initial study about the proposed ordinance: "There is a potential that the banning of plastic bags in the City of Manhattan Beach may result in an increase in paper bag usage. The proposed ordinance does require that all paper bags used in the City at point of sale be at least composed of 40% recyclable material. However, it is well documented that the manufacture and recycling of paper can consume more energy than plastic bags generate [more wastewater than plastic bags]. This increased use of energy could have an impact on the environment by increasing emissions from paper mills and recycling plants and possibly from trucks carrying the heavier, bulkier paper bags. [¶] However, the banning of plastic bags by political subdivisions is not widespread. In California only San Francisco, Oakland and Malibu have enacted such bans and Oakland's was invalidated by a court. San Francisco's ban does not include biodegradable plastic bags and so will not displace all plastic bag usage. [Malibu is a City of only 12,575 with an extremely small retail component within its boundaries.] [¶] The population of Manhattan Beach is only 33,852 according to the 2000 census. However, per capita bag usage would provide an inflated measurement of any net increase in paper bag use since the proposed ordinance does not ban the use of plastic bags by residents but their distribution at point of sale. Only 11.2% of the City is zoned commercial and there are only 217 licensed retail establishments within the City which might use plastic bags. There are only two supermarkets, three (and two future) drug stores, and one Target store *548 known to be high volume users of plastic shopping bags in the City which would be affected by the ban. The remaining businesses tend to be smaller and lower volume and many restaurants and most fast food outlets already use paper bags for take out orders. [¶] Plastic bags would not be replaced by paper bags on a one to one ratio since paper bags have a higher capacity. One study (commissioned by the plastic bag industry) estimates that for every 1500 plastic bags it would take 1000 paper bags to replace them. Other studies find that paper bags may hold up to four times the volume of plastic bags. In light of anticipated education efforts, increased publicity (partially resulting from the subject ordinance), and the public's increased concern for pollution and water quality, at least some percentage of plastic bags are expected to be replaced by reusable bags rather than paper bags. [¶] ... [¶] Based on the foregoing it appears that any increases in the total use of paper bags resulting from the proposed ban on plastic bags in Manhattan Beach (and even considering it as a cumulative increase from the bans in Malibu and San Francisco) would be relatively small with a minimal or nonexistent increase in energy consumption [pollutants generated from production and recycling]. [This is counterbalanced by a modest reduction in plastic refuse being generated in a coastal region. No further investigation is required.]"
Even if the ordinance is a project, "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3), italics added.) Moreover, the CEQA guidelines provide for an exemption from CEQA when, as here, the project, is one undertaken to assure the "maintenance restoration, enhancement, or protection of the environment ...." (Cal. Code Regs., tit. 14, § 15308; see also id., § 15307.) Also, "[a] project that qualifies for neither a statutory nor a categorical exemption may nonetheless be found exempt under what is sometimes called the `commonsense' exemption, which applies `[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment' (CEQA Guidelines, § 15061, subd. (b)(3)). [Citation.]" (Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra, 41 Cal.4th at p. 380.) Common sense suggests the ordinance is not subject to CEQA.
This small residential city, with only 217 licensed retail establishments that might provide plastic bags, would have a comparatively infinitesimal distribution of paper bags. Many of the City's residents undoubtedly obtain their bags from vendors outside the city. Paper bags may be bulkier than plastic bags, but they also are largerrequiring fewer bagsand can be recycled. Every possible increased use of paper does not compel an EIR. Moreover, this ordinance does not endorse paper bags. Rather, it promotes reusable bags.
*549 Petitioner relies upon the 2005 report from a private company on a proposed Scottish tax on European-made bags in Scotlanda country of over 5,000,000 million inhabitants. That report deals with environmental, business, economic, and consumer effects of the tax. The report evaluates all types of different bag materials, sizes, weights and recyclability, including with respect to a variety of plastics. These considerations, that might be relevant to a countrywide tax, have no relevance to the ordinance in the small city of Manhattan Beach. Presumably, the EIR desired by petitioner would emulate the multivolume, expensive Scottish company study that contains everything one might ever want to know about bags.
Petitioner also refers to a report by a group called Use Less Stuff, which concludes that the goal should be to find ways to reduce, reuse, and recycle both plastic and paper. This report considered such global subjects as energy consumption and greenhouse gas emissions. But there is no evidence that banning the distribution of plastic bags in the City will have any impact on natural resources or greenhouse gas emissions. The Boustead report used by petitioner was prepared "for the Progressive Bag Alliance"a group of American plastic bag manufacturers ( [as of Jan. 27, 2010]). The report began by bemoaning the notion that "[i]n the pursuit to eliminate all that is not green, plastic seems to be a natural target." Another report utilized by petitioner is the Franklin report, which was prepared for the Council for Solid Waste Solutionsan organization sponsored by plastic manufacturers ( [as of Jan. 27, 2010]) and focuses on the merits of plastic bags. All of these reports deal with the subject of paper versus plastic in an undefined territory.[6] I do not consider these reports to constitute substantial evidence that a distribution ban within this small city will impact the environment.
The City should not have to consider the effect of a ban on the distribution (not use) of plastic bags in the City on such matters as deforestation, energy use, acid rain, greenhouse gas emissions, water, waste, and air quality. These purported elements are not significantly affected by this small-scale application of the ordinance. Again, any possible public agency act that might involve the use or distribution of paper could, under the trial court's decision, require an EIR.
*550 Petitioner stresses some hypothetical, cumulative impact of the ordinance. A cumulative impact "... means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, ... and the effects of probable future projects." (Pub. Resources Code, § 21083, subd. (b)(2).) Petitioner has not provided any evidence of the combined impacts of the other projects and the City's ordinance. At the time of the enactment of the ordinance, only Malibu and San Francisco had such bans on plastic bagsand San Francisco's ban covered only large supermarkets and pharmacies[7] and did not include biodegradable plastic bags. The City was only the second city in California to enact an ordinance such as the one involved here. The City notes that since then, Palo Alto enacted a limited ban, and Fairfax has enacted a ban. Los Angeles County simply called for a voluntary action. The City represents that none of the public entities that enacted such an ordinance before the City did (Malibu and San Francisco) prepared an EIR in connection with their measures. Who would have thought to do so?[8] Now that petitioner is on the litigation warpath, other cities (some or all after the judgment in this case) have been pressured to prepare or consider preparing an EIR.[9] This record does not have sufficient evidence to show a cumulative, significant impact of the ordinance on the environment.
I agree with the spirit of the landmark opinion of Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], disapproved on another ground in Kowis v. Howard (1992) 3 Cal.4th 888 [12 Cal.Rptr.2d 728, 838 P.2d 250], that CEQA should be interpreted broadly. But that court continued, "We may not, of course, give an unreasonable construction to the statute." (Friends of Mammoth, at p. 259.) The Legislature and judiciary generally have taken steps to ensure that environmental impacts are given consideration, including when government acts. But that does not mean that we must apply environmental laws in a commercial dispute or when efforts are made to protect the environment in a limited area, just because of some hypothetical, de minimis effects of an ordinance. I do not believe "it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].)
*551 I could go on, but the proper result in this case seems self-evident. In this day of limits, we must interpret statutes reasonably so as not to require the unnecessary expenditure of public monies for no corresponding benefit. I would reverse the judgment.
NOTES
[1] All further statutory references are to the Public Resources Code unless otherwise noted.
[2] Water body eutrophication involves the following: "[E]u.troph.ic ... [¶] adj. Having waters rich in mineral and organic nutrients that promote a proliferation of plant life, especially algae, which reduces the dissolved oxygen content and often causes the extinction of other organisms. Used of a lake or pond. [¶] [From Greek eutrophos, well-nourished: eu-, eu- + trephein, to nourish.] [¶] eu-troph'i.ca'tion n., eu'tro-phy ... n." ( [as of Jan. 27, 2010], italics & boldface omitted.)
[3] All references to "Guidelines" are to the Guidelines for the California Environmental Quality Act, California Code of Regulations, title 14, section 15000 et seq.
[1] The City's Staff Report on the ordinance concludes that "the City Council could consider a plastic bag ban as the first step toward encouraging the use of reusable bags. If the City Council decides to adopt [the ordinance], Staff will begin an aggressive education and outreach campaign to inform our residential and business community of the ban and to promote the use of reusable bags."
[2] Petitioner Save the Plastic Bag Coalition includes plastic bag manufacturers and distributors.
[3] The executive director of the United Nations Environment Programme (UNEP) stated that plastic bags should be banned or phased out rapidly because of the ocean litter and danger plastic bags cause to humans and wildlife. (UNEP Head Calls for World-Wide Ban on Pointless Thin Film Plastic Bags (June 8, 2009) [as of Jan. 27, 2010].)
[4] There is nothing in the record as to the qualifications of the Manhattan Beach City Attorney referred to by the majority. But if his qualifications support his statement that the ordinance is a project, those same qualifications should be respected in connection with his opinion that no EIR is required.
[5] Perhaps an EIR is necessary for all the paper used by petitioner to obtain favorable reports and to institute litigation to challenge ordinances restricting plastic bags, and for the paper to be used in the EIR's demanded by petitioner.
[6] The Los Angeles County report referred to by the majority identifies no substantial effect of paper bags on the environment. It states, "Paper carryout bags are less likely to be littered because they are heavier and less likely to become airborne, as well as have a higher recycling rate (e.g., they are universally collected at curbside and have a recycling rate of 21 percent); and, [¶] ... [p]aper carryout bags will biodegrade in the marine environment, minimizing the negative environmental impacts." (Fn. omitted.)
[7] See Comment, The Evolution of San Francisco's Plastic-Bag Ban (2007) 1 Golden Gate U. Envtl.L.J. 439.
[8] Admittedly, other public entities have proposed bans on plastic bags. Petitioners are active in fighting any such bans and have commenced litigation to challenge the proposals and enactments.
[9] At oral argument, the Presiding Justice declared we would not consider postjudgment events that are not the subject of a request for judicial notice. There was no such request.